LONE PINE STEERING COMMITTEE; Carter-Wallace, Inc.; the Coca-Cola Company; Millipore Corporation; Minnesota Mining & Manufacturing Company; the Nestle Company, Inc.; and Owens-Illinois, Inc., Plaintiffs,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.

Civ. A. No. 84–4513.

United States District Court, D. New Jersey.

Jan. 21, 1985.

Porzio, Bromberg & Newman by Michael D. Loprete, Morristown, N.J., and Breed, Abbott & Morgan by Randy M. Mott, Michael McBride, Washington, D.C., and King & Spalding by Charles H. Tisdale, Jr., J. Sedwick Sollers, III, Atlanta, Ga., for plaintiffs.

W. Hunt Dumont, U.S. Atty. by Samuel P. Moulthrop, Asst. U.S. Atty., Newark, N.J., and William K. Sawyer, Asst. Regional Counsel, United States Environmental Protection Agency, Region II, New York City, for defendant.

DEBEVOISE, District Judge.

### I. *Nature of the Proceedings*

Plaintiffs, Lone Pine Steering Committee and six corporations whose wastes were or may have been disposed of in the Lone Pine Landfill in Freehold, New Jersey ("Lone Pine"), instituted this action against the United States Environmental Protection Agency ("EPA")[1] seeking declaratory and

---

1. To assist the reader of this opinion I list here the initials, acronyms and shortened names which will be used:

CDM —Camp, Dresser & McKee, Inc.

CERCLA —Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq.

DEP —New Jersey Department of Environmental Protection.

Draft Feasibility Study—Camp, Dresser & McKee, Inc.'s Draft Feasibility Study Evaluation of Potential Action Alternatives issued in June 1983.

EPA —The United States Environmental Protection Agency.

Lone Pine —Lone Pine Landfill located in Freehold, New Jersey.

NCP —National Contingency Plan.

NEPA —The National Environmental Policy Act, 42 U.S.C. §§ 4332, et seq.

Removal Fund —The Hazardous Substance Removal Fund.

ROD —Record of Decision.

Steering Committee —Lone Pine Steering Committee consisting of the corporate plaintiffs in this case.

injunctive relief relating to the closure of Lone Pine.

Reduced to its bare essentials the complaint alleges that plaintiffs have conducted scientific studies of the Lone Pine site and have developed a remedial plan for the closure of the landfill which meets all of the requirements of the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. §§ 9601, et seq. ("CERCLA") and of the National Contingency Plan adopted pursuant to the Act ("NCP"); plaintiffs intend to implement their remedial plan using funds from parties whose wastes are in the landfill; in violation of CERCLA and the NCP, EPA has failed to evaluate plaintiffs' plan and has issued a Record of Decision ("ROD") which obligates the Agency to spend at least $17 million in federal and state funds for the closure of Lone Pine; the ROD is based upon inaccurate and incomplete technical data and contains erroneous assumptions, resulting in duplicative and unnecessary corrective measures for which the limited moneys in the Hazardous Substance Removal Fund ("Removal Fund") will have to be expended in the first instance and for which plaintiffs, among others, may ultimately be liable.

Plaintiffs' remedial plan provides for the placement of a barrier layer or cap over the entire 50 acre site to prevent local exposure to contaminated materials and to reduce significantly the infiltration of rain which would otherwise carry contaminants through the sandy soils in the landfill and into the environment. The plan also provides for additional hydrogeological investigation of groundwater conditions to determine if there is any threat to deep aquifers below the landfill. Finally plaintiffs' plan calls for a 20-year monitoring program and, if the monitoring shows deteriorating conditions, contingency action which would be implemented to prevent environmental harm.

EPA's ROD, like plaintiffs' plan, calls for a clay cap over the entire Lone Pine site and for additional hydrogeological study. Unlike plaintiffs' plan, however, the ROD contemplates construction of an underground wall (slurry wall) around the landfill and pumping and treatment of contaminated groundwater. These latter two measures, plaintiffs contend, are completely unnecessary to ensure compliance with applicable laws and regulations, will exhaust the Removal Fund whose limited resources should be spread among as many dangerous sites as possible, and threaten plaintiffs with unwarranted liability if EPA should seek in the future to recover the costs from them.

The complaint advances seven grounds for relief. The substance of these claims are that: (i) EPA's actions constituted a violation of specific provisions of CERCLA (Counts 1, 2 and 4); (ii) EPA's actions are arbitrary, capricious and unsupported by the facts, and since the adoption of the ROD is a final agency action it is reviewable under the Administrative Procedure Act, 5 U.S.C. § 704 (Count 3); (iii) EPA's failure to accord plaintiffs a fair hearing and an opportunity to contest the reasonableness of the expenditures it proposes deprives plaintiffs of property without due process of law in violation of the United States Constitution (Count 5); (iv) EPA has violated the National Environmental Policy Act, 42 U.S.C. §§ 4332, et seq. ("NEPA") by failing to provide for full public participation in an environmental impact statement or its functional equivalent (Count 6); and (v) plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 (Count 7).

Plaintiffs moved for temporary restraints, expedited discovery and a preliminary injunction. At the hearing upon the application for a temporary restraining order EPA advised that, with the exception of the hydrogeological investigation, it did not intend to proceed with its plan in the immediate future and it undertook to advise plaintiffs of any significant step before it was undertaken. The parties agreed to meet to seek agreement upon a single hydrogeological study. Consequently there was no need for a temporary restraining order.

Shortly thereafter EPA moved to dismiss the complaint for lack of jurisdiction. A

hearing was held on the questions of (i) the court's jurisdiction and (ii) if there is jurisdiction, the scope of review.

II. *Applicable Statutory Provisions*

Congress enacted CERCLA in 1980 in response to increasing concern over the severe environmental and public health effects from improper disposal of hazardous wastes and other hazardous substances. The difficulty in responding quickly to environmental pollution problems resulting from spills of hazardous chemicals and abandoned waste sites posed a major problem. While EPA had some authority under other statutes to bring suit to require cleanups, it generally lacked the authority and the funds either to conduct itself or to compel private parties to conduct cleanup actions in response to environmental hazards. *See generally United States v. Price*, 577 F.Supp. 1103, 1109 (D.N.J.1983).

CERCLA was particularly designed to address these problems by giving EPA the authority and the funding to take or require immediate cleanup actions without the need for a prior determination of liability. *See* S.Rep. No. 96–848, 96th Cong., 2d Sess. (1980), 10–12, *reprinted in 1 Comm. on Environmental and Public Works, A Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980*, at 317–19 (1983).

Sections 104–107 and 221 of CERCLA are the major elements of the statutory program. Section 104, 42 U.S.C. § 9604, authorizes EPA to take "response actions", (i.e., cleanup a site), whenever there is a release or threatened release of a "hazardous substance". Response actions include a broad variety of investigative, evaluative, and cleanup activities, and may involve either the "removal" of threats posed by hazardous substances, or the implementation of "remedial" measures designed to affect a permanent remedy. Sections 101 (23–25), CERCLA, 42 U.S.C. §§ 9601(23)–(25).

The National Contingency Plan required by Section 105, 42 U.S.C. § 9605 ("NCP") guides these response activities. 40 C.F.R. Part 300. It sets forth methods for discovering and investigating sites at which hazardous substances have been located, methods for remedying releases of hazardous substances, and criteria for determining the appropriate extent of response activities.

EPA response actions under Section 104 are initially financed through the Hazardous Substance Response Trust Fund (the "Fund") created by Section 221 of CERCLA, 42 U.S.C. § 9631.

As an alternative to an EPA cleanup under Section 104, Section 106 of the Act, 42 U.S.C. § 9606(a), provides EPA with the authority to compel responsible parties to cleanup or abate actual or threatened releases of hazardous substances posing an "imminent and substantial danger" to health or the environment. Actions for injunctive relief to abate such dangers may be brought by the Attorney General in the federal district court in the district where the site is located. 42 U.S.C. § 9606(a). In addition, this section gives EPA the authority to issue such administrative orders as may be necessary to protect public health and welfare and the environment. Necessarily, this includes the authority to issue orders directing one or more responsible parties to undertake removal or remedial actions. *See* CERCLA Section 107(c)(3), 42 U.S.C. § 9607(c)(3).

EPA may bring an action in district court to enforce its administrative orders and to seek penalties of $5,000 for each day of "willful" violation. 42 U.S.C. § 9606(b). If EPA decides to cleanup the site itself when faced with noncompliance, it may recover its costs under Section 107(a) and may seek punitive damages under Section 107(c)(3) of three times the cleanup costs if the party's failure to comply was "without sufficient cause." 42 U.S.C. § 9607(c)(3).

Both the statute and the regulations implementing it require that to the greatest extent feasible the removals and remedial actions be performed by the parties responsible for the hazardous condition and that costs be kept at the minimum amount consistent with the elimination of the hazardous condition.

Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1), authorizes EPA to take curative action consistent with the NCP *"unless* [EPA] determines that such removal and remedial action will be done properly by the owner or operator ... of the facility from which the release or threat of release emanates, or by any other responsible party." (Emphasis added.) Section 105 of CERCLA, 42 U.S.C. § 9605 requires that the NCP include "(9) specified roles for private organizations and entities in preparation for response and in responding to release of hazardous substances, including identification of appropriate qualifications and capacity therefor." Implementing these statutory requirements 40 C.F.R. § 300.68(c) provides:

As an alternative or in addition to Fund-financed remedial action, the lead agency may seek, through voluntary agreement or administrative or judicial process, to have those persons responsible for the release clean up in a manner that effectively mitigates and minimizes damage to, and provides adequate protection of, public health, welfare, and the environment. The lead agency shall evaluate the adequacy of clean-up proposals submitted by responsible parties or determine the level of clean-up to be sought through enforcement efforts, by consideration of the factors discussed in paragraphs (e) through (j) of this section. The lead agency will not, however, apply the cost balancing considerations discussed in paragraph (k) of this section to determine the appropriate extent of responsible party clean-up.

Both the statute and the regulations reflect Congressional intent that EPA "may *not* act where the party responsible for the release or threatened release ... will take proper action." H.R.Rep. No. 1016, Part 1, 96th Cong., 2d Sess. *reprinted in* 1980 U.S.Code Cong. & Ad.News 6119, 6131. (Emphasis added.) When CERCLA was originally enacted, its principal House sponsor, Representative Florio, stated in the floor debate:

[as to] apprehensions [that] EPA is going around to automatically start cleaning things up and suing someone. That situation is not going to occur because EPA is required not to act if the responsible party or parties will take appropriate action to cleanup and contain these sites.

Cong.Rec. H9467 (daily ed. Sept. 23, 1980). *See* H.R.Rep. No. 96–1016, Part 1, 96th Cong., 2d Sess. (1980); S.Rep. No. 848, 96th Cong., 2d Sess. (1980).

The statute and regulations also contain specific directions to minimize costs. Section 104(c)(4), 42 U.S.C. § 9604(c)(4), provides that:

The President shall select appropriate remedial actions determined to be necessary to carry out this section which are to the extent practicable in accordance with the national contingency plan and which provide for that cost-effective response which provides a balance between the need for protection of public health and welfare and the environment at the facility under consideration, and the availability of amounts from the Fund established under subchapter II of this chapter to respond to other sites which present or may present a threat to public health or welfare or the environment, taking into consideration the need for immediate action.

Section 105, 42 U.S.C. § 9605, requires that the NCP include:

(2) methods for evaluating, including analyses of relative cost, and remedying any releases or threats of releases from facilities which pose substantial danger to the public health or the environment;

.    .    .    .    .

(7) means of assuring that remedial action measures are cost-effective over the period of potential exposure to the hazardous substances or contaminated materials.

Implementing these statutory directives, 40 C.F.R. § 300.68(j) provides:

The appropriate extent of remedy shall be determined by the lead agency's selection of the remedial alternative which the agency determines is cost-effective (i.e. the lowest cost alternative that is technologically feasible and reliable and which

effectively mitigates and minimizes damage to and provides adequate protection of public health, welfare, or the environment).

A principal purpose of the provisions requiring that a responsible party undertake the removal or remedial action if feasible and requiring that such undertakings be accomplished at a minimum cost is to preserve the Removal Fund so as to maximize the number of hazardous sites which will be cleaned up.

When it is necessary for EPA to effect curative action CERCLA contemplates that monies expended from the Fund for cleanup will, where possible, be recovered from "responsible parties" through the liability provisions set out in Section 107, 42 U.S.C. § 9607. *See generally State ex rel. Brown v. Georgeoff,* 562 F.Supp. 1300, 1308 (N.D. Ohio 1983).

Section 107(a) of CERCLA imposes liability for the costs of response activities upon the persons responsible for the releases of hazardous substances. The United States may recover such costs, if "not inconsistent with the National Contingency Plan," from:

(1) the owner or operator of the site;

(2) any person who owned or operated the site at the time hazardous substances were disposed of at the site;

(3) any person who arranged to have his own wastes taken to the site for disposal or treatment; and

(4) any person who transported wastes for disposal or treatment to a site he selected.

42 U.S.C. § 9607(a). Liability under this section is subject to three defenses: an act of God, acts of war, or certain acts or omissions of third parties. Section 107(b), 42 U.S.C. § 9607(b).

### III. *The Basis of Plaintiffs' Claims*

Plaintiffs allege that EPA's adoption of the ROD violated various of these statutory and regulatory provisions. To set plaintiffs' contentions in focus, a summary of the events which led to the present litigation would be useful.

Lone Pine is a landfill located in Freehold, New Jersey. For many years it was used legally for the disposal of both municipal and industrial wastes. There came a time when it was closed for the purpose of receiving industrial waste, but it was still authorized to receive municipal waste and septic sludge. During that time very substantial amounts of chemical waste was dumped at Lone Pine illegally. In 1979 Lone Pine was closed altogether. However, by that time it posed a serious threat to local residents, wells and the proposed use of the Manasquan River as a source of drinking water. Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA ranked Lone Pine to determine whether it was one of the most serious waste sites in the nation and, therefore, eligible for money made available under CERCLA. Lone Pine has consistently been ranked among the fifty worst sites in the United States.

In 1981 and 1982 EPA, along with the New Jersey Department of Environmental Protection (DEP), pursued various studies and investigations seeking to ascertain the extent of the contamination emanating from the site and to determine the potential threat to public health and the environment.

On July 6, 1982 EPA sent "notice" letters to fourteen companies informing each one that it "may be a responsible party with respect to the releases and threatened releases" of hazardous substances from the Lone Pine site. The fourteen companies included five of the six corporate defendants in this action. On September 3, 1982 a notice letter was sent to plaintiff Coca-Cola Company. EPA requested each company to perform a feasibility study evaluating remedial alternatives for the landfill and other response activities.

No private party committed itself to undertake the work, and EPA proceeded to take steps in anticipation of doing the work itself. It held a public hearing on September 16, 1982 and conducted additional extensive studies.

In the spring of 1983 five of the companies that had received the notice letters formed the Lone Pine Steering Committee ("Steering Committee") to evaluate condi-

tions at Lone Pine and to determine the appropriate remedial action.

In June of 1983 EPA released for public comment a three volume "Draft Feasibility Study Evaluation of Remedial Action Alternatives (the "Draft Feasibility Study") prepared by the Agency's consultant Camp, Dresser & McKee, Inc., ("CDM"). This study reviewed five remedial action alternatives ranging from no action to a total excavation and removal of contaminants. EPA and CDM representatives participated in a public meeting to discuss the Draft Feasibility Study. The Steering Committee's preference was for a remedial plan involving a clay cap over the landfill, a monitoring program and additional remedial actions in the event that monitoring disclosed that conditions at the site had deteriorated. EPA expressed a preference for a plan which would involve: (a) placement of a clay cap, (b) construction of an underground wall (slurry wall) around the landfill, and (c) pumping and treatment of contaminated ground water.

In response to comments it had received (including comments from five of the six corporate plaintiffs), EPA proceeded to study additional remedial options. This resulted in a Supplemental Feasibility Study prepared by CDM and released on June 27, 1984. It proposed the plan outlined in the Draft Feasibility Study for which EPA had expressed an initial preference. As to the Steering Committee's more limited alternative, the Supplemental Feasibility Study stated:

> Recently conducted simulations have shown that capping the landfill will most likely significantly reduce the net influx of contaminants to the river. Therefore, landfill capping and monitoring cannot be immediately dismissed as a remedial alternative because source strength will be reduced over time following capping.
>
> .   .   .   .   .
>
> Alternative 1, landfill capping and location monitoring, would likely reduce the contaminant source input to the groundwater, but implementation of this alternative is also problematic. The purpose of the monitoring system is to provide

early warning relative to the presence of a substance that would potentially cause a hazard and to provide a measure of effectiveness of the remedial scheme that has been implemented. Since these contaminants would have a potential impact on the downstream water supply, contingency plans must be prepared. These would include plans and specifications for a groundwater and leachate treatment system. These design documents and the appropriate funding mechanism provide a means for rapidly installing a groundwater treatment system. Based upon these concerns, Alternative 1 was eliminated from further consideration.

EPA extended the initial public comment period until August 1984 and held another public meeting on August 1, 1984, at which time the Steering Committee presented its remedial proposal.

Meanwhile, following receipt of the Supplemental Feasibility Study, the Steering Committee directed its consultants to prepare a remedial action plan that would address CDM's concern about the need for a detailed contingency plan to back up a cap and monitoring program. In July and August 1984, the Steering Committee and its consultants also met with local citizens' groups to solicit their comments and input into the preparation of a comprehensive remedial plan.

On September 12, 1984, EPA sent notice letters to approximately 142 companies, including corporate plaintiffs, notifying each company of its statutory right to undertake proper remedial action which EPA proposed be done at Lone Pine *prior to* EPA's (a) use of federal "Superfund" monies for remedial action, and (b) subsequent cost recovery action against it. EPA advised that it proposed to proceed with the alternative recommended by CDM and asked each recipient to advise it of the portions of those corrective measures which the recipient was willing to undertake. EPA requested a response by September 26, 1984.

On September 21, 1984, EPA's Region II Office recommended that the EPA Assist-

ant Administrator make a decision on the remedial program.

On September 26, 1984, the date designated by EPA in its September 12 notice letters, the Steering Committee presented a comprehensive remedial action plan for Lone Pine to EPA, DEP and local citizens. This Plan includes an analysis of the existing environmental conditions and a program for remedial action. Plaintiffs' Plan involves the placement of an impermeable barrier layer or cap over the entire 50 acre site. This cap will prevent local exposure to contaminated materials and will significantly reduce the infiltration of waters through the mound and the resultant leachate from the site.

Plaintiffs' Plan also includes a program for additional hydrogeological investigation of groundwater conditions, to determine whether there is any threat to deep aquifers below the landfill. A twenty-year monitoring program is also proposed. If monitoring shows deteriorating conditions, contingency plans for additional remedial action are set forth. Finally, plaintiffs' Plan includes provisions for public participation and for private funding of additional remedial action.

Of course, instead of offering to perform some or all of the alternative plan EPA had selected as requested in EPA's September 12 letter, the Steering Committee submitted its own alternative plan. Even as to that Plan, the Steering Committee made it abundantly clear that it was not offering to implement it, stating:

> While this letter and the enclosed Action Plan constitutes the response of the members of the Lone Pine Steering Committee to EPA's letter of September 12, 1984, by describing the nature and extent of corrective measures which we *may* be willing to undertake at Lone Pine, we would emphasize that the Steering Committee has consistently taken the position that the financial responsibility for implementing remedial action at Lone Pine *must* be shared by *all* parties who operated, used or whose wastes were disposed of at Lone Pine. Accordingly, the Action Plan is presented as the basis for a comprehensive negotiated settlement by all responsible parties (whether or not identified to date by EPA) and *should not be viewed as a commitment to undertake this program in the absence of such a program.* (Emphasis added.)

On September 28, 1984, two days after plaintiffs' Plan and non-offer to perform it was submitted, EPA's Assistant Administrator signed the Record of Decision. The ROD chose an initial source containment strategy at Lone Pine involving the installation of a clay cap over the landfill, a shallow subsurface cutoff wall known as a slurry wall, and extraction wells inside the wall for hydraulic reasons. EPA also determined that additional investigative studies would be undertaken to delineate the extent of offsite contamination and to assess the need for further action. Unless responsible parties undertake to complete EPA's plan, which seems unlikely, this plan will be paid for at public expense with the expectation that EPA will later seek reimbursement pursuant to Section 107 of CERCLA, 42 U.S.C. § 9607.

Plaintiffs charge that "EPA totally ignored Plaintiffs' Plan. Only two days after receipt of the Plan, with no opportunity to accord the Plan even cursory review, EPA issued its ROD 'selecting' the alternative proposed by CDM—a cap, slurry wall and groundwater pumping and treatment system." (Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction at p. 8). Of course, the Steering Committee had expressed to EPA its preference for and its reasons for advocating its more limited concept during the course of its comments upon the June 1983 Draft Feasibility Study, in response to the June 27, 1984 Supplemental Feasibility Study and on various other occasions. A more detailed study of the record will be required to determine how much of substance was added by the September 26, 1984 submission.

Out of this series of events arise plaintiffs' attacks on EPA's adoption of the ROD and decision to proceed with the plan

described therein. Specifically plaintiffs contend:

First: EPA, by rejecting out of hand the Lone Pine Committee's Plan submitted on September 26, 1984, has violated Section 104(a) of CERCLA, 42 U.S.C. § 9604 which permits EPA to proceed with its own plan only if it finds that remedial action will not be done properly by a responsible party. In its Supplemental Feasibility Study CDM rejected the Steering Committee's approach because contingency plans had not been prepared. Thereafter the Steering Committee prepared contingency plans and submitted them as part of its September 26 Plan. Since EPA did not even consider plaintiffs' Plan, so plaintiffs' argument goes, there was not and could not have been any factual bases for its determination that the Plan (with its contingency plans) was inadequate.

Second: Plaintiffs' plan contains the same elements as the ROD. However, the slurry wall and the pumping and treatment of groundwater is phased over time, dependent upon whether monitoring data suggest changes in contamination constituents which would require these further remedial steps. Failure to follow plaintiffs' Plan is a violation of Section 105, 42 U.S.C. § 9605 and of the NCP which require that EPA select the remedial alternative which is cost effective, i.e., "the lowest cost alternative that is technologically feasible and reliable and which effectively mitigates and minimizes damage to and provides adequate protection of public health, welfare or the environment." 40 C.F.R. § 300.68(j).

Third: Plaintiffs assert that EPA's action has foreclosed them from participating in the Lone Pine cleanup, thus threatening them with economic loss when EPA seeks to recover its costs in a post-cleanup proceeding and threatening them with injury to their reputations. Having been denied a pre-remedial response action hearing, plaintiffs claim to have been deprived of their rights without due process of law.

Fourth: NEPA directs the federal government "to the fullest extent possible" to prepare a "detailed environmental impact statement for all 'major Federal actions significantly affecting the quality of the human environment.'" 42 U.S.C. § 4332. Since EPA has failed to file an environmental impact statement, to follow NEPA procedures or to provide "the functional equivalent" of an environmental impact statement it is, according to plaintiffs, in violation of NEPA.

Fifth: Plaintiffs charge, finally, that EPA's actions violate the Administrative Procedure Act in that (i) EPA has acted outside the scope of its statutory authority; (ii) EPA has acted arbitrarily and capriciously and otherwise not in accordance with law; and (iii) EPA has failed to comply with procedural requirements mandated by CERCLA, such as making the determination whether private remedial action will be done properly so as to obviate the need for an agency response.

### IV. *Jurisdiction of the Court*

The initial question in this case is whether the court has jurisdiction to address the issues plaintiffs advance. I conclude that the court does not have jurisdiction and that EPA's motion to dismiss should be granted.

It is true that Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), provides that "the United States district courts shall have exclusive original jurisdiction over all controversies arising under this Chapter...." That, however, is only a starting point. It does not mean that every action of EPA taken in the course of administering CERCLA is reviewable by means of a district court action. As in the case of every regulatory statute, "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objective, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Institute,* — U.S. —, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984).

Both the legislative history and the language of CERCLA suggest that to allow judicial review of a ROD by an entity which may (or may not) be the subject of a subse-

quent recovery action would frustrate Congress' intent to provide a mechanism whereby hazardous sites can be neutralized expeditiously.

Congress enacted CERCLA in 1980 in response to increasing concern over inactive or abandoned sites that contain hazardous wastes or other hazardous substances. Earlier legislation had not effectively dealt with inactive sites. In addition, earlier statutes as well did not permit EPA to respond quickly to problems at a site. While EPA had authority under other environmental statutes to bring legal actions to force cleanup, it lacked clear authority and funds to respond immediately to serious public health hazards from such sites and releases before the legal determinations of liability were made. CERCLA was designed to address this problem by establishing the authority and funding to take immediate response actions, without the need to await a judicial determination of liability (and likewise, before any final administrative determination of liability). *J.V. Peters & Company, Inc. v. Ruckelshaus*, 584 F.Supp. 1005, 1011 (N.D.Ohio 1984).

The legislative history underscores that Congress intended to empower EPA to take prompt action without the delays associated with litigation. For example, in discussing Section 104 of CERCLA, 42 U.S.C. § 9604, the Senate Committee wrote:

> The paramount purpose of this Section is the protection of the public health, welfare and the environment. It is recognized that government response will often be necessary prior to receipt of evidence which conclusively establishes the substances or materials released or the origin of their release, discharge or disposal. Because *delay will often exacerbate an already serious situation*, the bill authorizes the President to respond when a substantial threat of release may exist. This standard is intended to be a flexible one and holds that *it is preferable to err on the side of protecting public health, welfare and the environment in administering the response authority of the fund.*

S.Rep. 96–848, 96th Cong., 2d Sess. 56 (1980), *reprinted in* A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, at 363. (Emphasis added.)

The language used in the Act itself demands a speedy response in cleaning up dangerous sites. For example, the Act authorizes responses if there is a "substantial threat of release," thereby recognizing that speed of response outweighs certainty of damage under the Act. Section 104(a)(1), 42 U.S.C. § 9604(a)(1). The Hazardous Substance Response Trust Fund ("Fund") was established to enable response activities to begin expeditiously, rather than having to await the outcome of litigation.

To follow the course which plaintiffs suggest and to allow judicial review of the ROD at this juncture would totally frustrate one of the major objects of CERCLA—prompt action to clean up highly threatening waste sites. Plaintiffs urge that review should be de novo. That, of course, would require a lengthy trial in this court with the possibility of an appeal. Even a judicial review of the EPA action simply on the record before the agency would entail extensive activity in this court and again the possibility, or even likelihood, of a time consuming appeal. Meanwhile with every passing rainstorm and each day while melting snow percolates through the Lone Pine Landfill deadly chemical wastes would be carried towards the water supplies of substantial numbers of people.

In their papers seeking injunctive relief and in their arguments before the court, plaintiffs have presented a distorted version of the true state of affairs. They suggest that on September 12, 1984 EPA for the first time notified potentially responsible parties of their right to undertake remedial action at Lone Pine; that on September 26, 1984 the Steering Committee, in response to that letter, submitted a detailed plan for effective remedial action and offered to assume complete financial responsibility for putting it into effect; and that on September 28, 1984, without even considering the Steering Committee plan,

EPA issued its ROD which adopted the CDM alternative discussed above and committed EPA to undertake the remedial action at public expense.

What in fact happened was that since July 1982 EPA had been discussing with the corporate plaintiffs and others the best way to deal with the Lone Pine menace. At that time, if not long before, plaintiffs knew perfectly well that unless they assumed responsibility for effective remedial measures it was likely EPA would act. During the ensuing months through August 1984 a number of alternatives were discussed, including both the general concept incorporated in the Steering Committee plan and the concept proposed by CDM and adopted in the ROD. EPA's September 12, 1984 letter was not designed to put the Steering Committee on notice that it had an opportunity to prepare a remedial plan. Such notice had been given in the July 6, 1982 letters to five of the corporate plaintiffs and in the September 3, 1982 letter to the Coca-Cola Company. The September 12 letter was designed to inform potentially responsible parties that EPA had concluded that the CDM alternative was the best approach and to give the responsible parties an opportunity to perform all or a portion of the work required to implement that alternative.

The Steering Committee's September 26, 1984 letter was not responsive to the September 12 EPA letter. It did not commit the Committee or any of its members to perform all or any part of the CDM alternative. Instead it transmitted to EPA a beefed up version of the Committee's proposal. Significantly, the papers which plaintiffs presented to the court included the very attractive and impressive plan which accompanied the letter but did not include the covering letter itself. Though plaintiffs now wish the court to believe that they offered to complete at their own expense the capping and hydrogeological study portion of the work which was common to both plans, that was not at all the case. The September 26 letter, which EPA made available to the court, is a masterpiece of studied avoidance of commitment. It referred to the Steering Committee proposal as a plan the Steering Committee "*may*" be willing to undertake. It noted that financial responsibility "*must*" be shared by all parties who operated Lone Pine or whose wastes were disposed of there. The plan was presented as "the basis for a comprehensive negotiated settlement by all responsible parties (whether or not identified to date by EPA)". To make sure there was no mistake, the letter emphasized that it "should not be viewed as a commitment to undertake this program in the absence of such a [negotiated settlement]."

In the face of that letter plaintiffs seek to persuade the court that on September 26, 1984 they sincerely offered to implement at their expense the proposal to cap Lone Pine and conduct hydrogeological studies. I am confident that this letter was a continuation of the Steering Committee's good faith effort to formulate and ultimately implement an effective plan to deal with Lone Pine. I am sure it was not calculated to cause endless delay in effecting remedial action. However, had EPA been foolish enough to have acted upon the letter, long delay would have been the inevitable effect. EPA has identified 140 potentially responsible parties. There may be many more. Plaintiffs proposed to enter into negotiations with all of them to devise the best way to deal with Lone Pine and to allocate financial responsibility among them all. Plaintiffs, according to their letter, were unwilling to act until *all* of these known and unknown entities had agreed to share financial responsibility. Meanwhile, as the negotiating process ground forward, the poisons of Lone Pine would have been leaching through the soil towards and perhaps into vital New Jersey water supplies.

When EPA failed to accept plaintiffs' program and method of securing its acceptance, plaintiffs instituted this lawsuit seeking injunctive relief. I dwell on the scenario which plaintiffs' September 26 letter would have produced had EPA pursued it, because it is suggestive of the bog into which courts would descend if CERCLA were interpreted to permit potentially responsible parties to obtain judicial review

of the issuance of a ROD. Returning to the legal analysis:

Generally, the courts which have confronted the issue have held that a potentially responsible party may not obtain judicial review of EPA's adoption of a ROD and that such a party must raise his objections in a future cost recovery suit. This was the holding in *United States v. Outboard Marine Corp.*, 104 F.Supp. 405 (N.D.Ill. 1984) in which the court permitted the government to take a voluntary dismissal of its action to compel a cleanup in order that it could proceed with its own cleanup under CERCLA, anticipating recovery against the defendants in a subsequent cost recovery action. The court rejected defendants' attack on the validity of the ROD, stating that, "[t]he statutory scheme does not provide for any judicial review until such time as the United States sues to recover its cleanup costs."

In *Aminoil v. United States Environmental Protection Agency*, 599 F.Supp. 69 (D.Calif.1984), plaintiffs sought to enjoin implementation of an EPA order issued under Section 106(a) of CERCLA requiring allegedly responsible parties to submit a response plan. The court ruled "that the structure of the statute, its legislative history and cases construing it ... demonstrate that Congress did not intend to allow judicial review of such orders prior to commencement of either an enforcement action under § 106(b), 42 U.S.C. § 9606(b), or a recovery action under § 107(c)(3), 42 U.S.C. § 9607(c)(3)." To the same effect is the decision in *Earthline Company v. Kin-Buck, Inc.*, Civ. No. 83–4226 (D.N.J. July 23, 1984) in which the court dismissed for lack of jurisdiction an action seeking to enjoin EPA's implementation of an order which EPA issued under 42 U.S.C. § 9606(a).

*J.V. Peters & Co., Inc. v. Ruckelshaus*, 584 F.Supp. 1005 (N.D.Ohio, E.D.1984), considered a number of issues which are pertinent to the present case. There EPA proposed to pursue a response action pursuant to Section 104(a) of CERCLA, 42 U.S.C. § 9604(a). Plaintiffs, the former owners and operators of the waste facility involved, sued to enjoin implementation of the response action on the ground that EPA had not complied with the applicable provisions of CERCLA and the NCP. Upon defendants' motion to dismiss the court held: (i) The likelihood that EPA would ultimately institute a cost recovery action against plaintiffs gave them standing to sue; (ii) A federal court's exercise of jurisdiction over a waste facility owner's claim that EPA has failed to comply with these procedures would not contradict the purpose of CERCLA and thus plaintiffs are within the zone of interests to be protected by CERCLA; (iii) In view of the potential for liability which EPA's response action has upon plaintiffs, its decision to conduct the action constitutes final administrative action that is subject to review; (iv) Since the only way plaintiffs can avoid potential liability is to challenge the response action before it is conducted, the issues presented are ripe for review; (v) Since CERCLA contemplates that EPA will move promptly to meet substantial and imminent dangers, if owners and operators were permitted to maintain a suit in federal court whenever EPA was preparing a response action, the purpose of CERCLA would be severely undermined. Therefore, such suits can only be allowed when a claim of no rational basis or failure to follow mandated procedures is specifically alleged and supported by material facts, not merely conclusory statements; (vi) Since plaintiffs' complaint states merely conclusions, it fails to state a cognizable claim; (vii) Since plaintiffs will have an opportunity to assert their defenses in the subsequent cost recovery action and since CERCLA was enacted to permit EPA to respond swiftly to environmental emergencies, CERCLA does not violate plaintiffs' due process rights.

As discussed above, I do not agree with conclusion (ii) above that the exercise of federal court jurisdiction in such a case would not conflict with the purpose of CERCLA. I think the court in *Peters*, when arriving at several of its other conclusions, gave inadequate significance to the cost recovery action provisions of the statute. I will refer to these provisions at

greater length below. In any event I do not agree with the court's conclusion that a potentially responsible party may obtain judicial review of EPA's adoption of a ROD.

Plaintiffs urge that the appealability of an EPA action turns upon the nature of the action, i.e., whether it is designed to meet an imminent emergency or whether, like the issuance of a ROD, it is taken after careful planning to meet a long-term problem. The latter kinds of actions, according to plaintiffs, must be appealable even if the former are not. They distinguish the cases I cited above on this basis.

In support of their contentions plaintiffs note that CERCLA distinguishes on its face between "removal" and "remedial" actions. The statute classifies immediate response activities including emergencies as "removal" actions, 42 U.S.C. §§ 9601(23) and (24). The Act labels planned long-term construction projects, such as those contemplated by the instant ROD, as "remedial actions". Under CERCLA, "remedial actions" include "those actions consistent with permanent remedy taken instead of or in addition to removal actions...." 42 U.S.C. § 9601(24). The Act defines "confinement, perimeter protection using dikes, trenches, or ditches, clay cover ... [and] collection of leachate and runoff" as "remedial actions", not "removal actions".

Remedial actions, by their very nature, will require delays for planning, consultation, public hearings mandated by statute and regulations, and the like. Plaintiffs point to legislative comments which take account of the differences between removal and remedial actions. For example, a Senate Report notes

"Removal" refers to actions which must proceed without delay upon discovery of a release, discharge or disposal or threat thereof. In contrast, remedy or remedial action refers to potentially more costly, long-lasting response which may include the construction of major facilities and which must often be preceded by considerable study, investigation, planning and engineering before the appropriate actions can be determined.

S.Rep. No. 848, 96th Cong., 2d Sess. 54 (1980). While discussing the National Priority List, required by Section 105 of CERCLA, the Senate Committee noted that the list was "primarily informational":

[I]nclusion of a facility or site on the list does not itself reflect a judgment of the activities of its owner or operator, it does not require these persons to undertake any action, nor does it assign liability to any person. Subsequent government action in the form of *remedial action* or enforcement action will be necessary in order to do so, and *these actions will be attended by all appropriate procedural safeguards.*

*Id.* at 60. (Emphasis added.)

Plaintiffs argue that since remedial actions already are subject to time consuming requirements the imposition of the additional delays occasioned by judicial review will not impede the purpose of CERCLA. I cannot agree. CERCLA contemplates that remedial action will be taken as promptly as circumstances permit. It should be obvious that every day's delay in dealing with a hazardous waste site entails risks. Just because unavoidable delays are required to plan and implement a response does not mean that Congress contemplated the additional delays which judicial review would entail.

This conclusion is fortified by the fact that in the circumstances of this case the statute provides an opportunity for responsible parties to contest EPA's actions before they are obligated to pay anything. Section 107(a) of CERCLA provides the time and the place where EPA can seek reimbursement and where an allegedly responsible party can resist the claim. Plaintiffs urge that their rights under Section 107(a) are inadequate. That being the case, they argue, Section 107(a) cannot have been intended by Congress to be a substitute for judicial review of a ROD, and, if it were, it would violate plaintiffs' due process rights.

I see no reason why plaintiffs cannot raise as a defense in a cost recovery action every objection to the ROD which they

could legitimately raise in a judicial proceeding at this time. Assuming that plaintiffs are corporations who may be sued under Section 107(a) and assuming that EPA elects to sue them, recovery may only be for "costs of removal or remedial action incurred by [EPA] ... *not inconsistent with the national contingency plan.*" Section 107(a)(4)(A). The NCP must include, among other things, methods for analyzing relative cost and means of assuring that remedial measures are cost effective, i.e., the lowest cost alternative that is technologically feasible and reliable and which effectively mitigates and minimizes damage to and provides adequate protection of public health, welfare, or the environment. 42 U.S.C. § 9605; 40 C.F.R. § 300.68(j). Thus if the ROD requirement that the Lone Pine response include an underground wall around the landfill and pumping and treatment of contaminated water was not cost effective, it would not be consistent with the NCP and the costs of those portions of the response would not be recoverable by EPA in a Section 107(a) proceeding. Similarly, if plaintiffs have been prejudiced by any procedural irregularities in the adoption of the ROD, I see no reason why these irregularities could not be raised in a cost recovery action to the extent that they caused damage to the plaintiffs. In the light of EPA's arguments at the hearings in this case, EPA would be hard put to prevent plaintiffs from raising these issues in a Section 107(a) proceeding.

Nothing in *United States v. Northeastern Pharm. & Chem. Co.*, 579 F.Supp. 823 (W.D.Mo., S.D.1984) suggests a different conclusion. The court there held that in an action under Section 107(a)(4)(A) (as distinguished from an action under Section 107(a)(4)(B)) "the burden of proving inconsistency with the national contingency plan was that of defendants." 579 F.Supp. at 850. Wherever the burden of proof may lie, the defendant in a Section 107(a) proceeding has a full opportunity to present its case.

Further, plaintiffs contend that limiting judicial review to Section 107 actions for cost recovery would deprive the public of any opportunity to challenge EPA decisions. Plaintiffs pose the situation where an EPA response action is patently inadequate, exposing to serious danger persons who live or work in the vicinity of the hazardous wastes. Were there no judicial review of a ROD, plaintiffs assert, such persons would have no remedy—not even a review in a post hac proceeding.

One answer to this argument is that the statute may contemplate a different rule of judicial review in the case of a victim of a hazardous waste site. The statute is designed particularly to protect such persons, and, unlike the persons responsible for the hazardous waste, no specific provision is contained in the statute under which they can obtain judicial review. An analysis of the statute might lead to the conclusion that Congress did intend that the victims have the right to a judicial review of a ROD. In any event, it is unnecessary to resolve that question now. Whatever the answer, it does not affect my conclusion that the statute does not contemplate that entities such as plaintiffs can obtain judicial review of a ROD.

Having reached this conclusion it is unnecessary to discuss separately the questions of ripeness and standing.[2]

---

**2.** Plaintiffs also assert that the ROD is reviewable under the Administrative Procedure Act, 5 U.S.C. § 704. The considerations which lead me to conclude that CERCLA does not contemplate judicial review of a ROD also lead me to conclude that adoption of a ROD is not final agency action subject to review under the Administrative Procedure Act. *FTC v. Standard Oil Co.*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). Further, plaintiffs assert that EPA's actions violate NEPA because EPA has failed to file an environmental impact statement, to follow NEPA procedures or to provide the functional equivalent of an environmental impact statement. 42 U.S.C. § 4332. Plaintiffs' interests in this case (perfectly legitimate interests) are in their possible financial liability for the cost of EPA's remedial action at Lone Pine. Their interest in general environmental concerns has been neither pleaded nor demonstrated. Therefore, they lack standing under the "zone of interests" test, and their NEPA claim should be dismissed. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

For the reasons set forth above EPA's motion to dismiss the complaint will be granted. I have signed the order of dismissal which EPA's attorneys submitted with their motion.