LONE PINE STEERING COMMITTEE, Carter-Wallace, Inc., the Coca-Cola Company, Millipore Corporation, Minnesota Mining & Manufacturing Company, the Nestle Company, Inc., and Owens-Illinois, Inc., Appellants,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Appellee.

No. 85–5097.

United States Court of Appeals, Third Circuit.

Argued Oct. 1, 1985.

Decided Nov. 22, 1985.

As Amended Dec. 2, 1985.

Randy M. Mott (argued), Breed, Abbott & Morgan, Washington, D.C., Michael X. McBride, Esquire Breed, Abbott & Morgan, New York City, Charles H. Tisdale, Jr. (argued), King & Spalding, Atlanta, Ga., Myron J. Bromberg, John M. Newman, Porzio, Bromberg & Newman, P.C., Morristown, N.J., for appellants.

Kathleen P. Dewey (argued), David C. Shilton, Dept. of Justice, Washington, D.C., Roger J. Marzulla, Esquire Acting Asst. Atty. Gen., W. Hunt Dumont, U.S. Atty., Samuel P. Moulthrop, Asst. U.S. Atty., Newark, N.J., for appellee; Dov Weitman, Office of the Gen. Counsel U.S.E.P.A., Washington, D.C., William K. Sawyer, Asst. Regional Counsel, Region II, U.S.E.P.A., New York City, of counsel.

Before WEIS and BECKER, Circuit Judges, and ZIEGLER,* District Judge.

* The Honorable Donald E. Ziegler, United States District Judge for the Western District of Penn-sylvania, sitting by designation.

## OPINION OF THE COURT

WEIS, Circuit Judge.

To prevent harm from a toxic waste dump, the EPA planned construction to contain the contaminants and process ground water. On completion of the work, the EPA intends to bring suit for the costs incurred. Contending that the project was unnecessarily extensive, some of the parties allegedly responsible for the site condition sought an injunction. The district court dismissed the suit on the basis that pre-enforcement judicial review was contrary to statutory intent. We agree and affirm.

Plaintiff Steering Committee is composed of six corporations, which are part of a group of 142 companies alleged by the EPA to be responsible for the costs of remedying conditions at the Lone Pine Land Fill in Freehold, New Jersey. Investigations by the EPA revealed the presence of toxic substances dumped at the 45-acre landfill during its operation from 1959 to 1979. The area was closed in 1979.

The EPA, as well as the New Jersey Department of Environmental Protection, conducted various studies showing that contaminants were moving from the landfill to the Manasquan River. The toxic substances were reaching the river by two different routes, overland by surface runoff and through the permeable soil under the landfill by leaching into to acquifers which discharge into the river.

Although the Manasquan River is not presently being used for drinking water, it is contemplated that in the future an intake will be constructed some 16 miles downstream from Lone Pine.

The parties disagree about the extent of contamination and its effect on the environment. However, it is undisputed that the landfill contains a substantial amount of toxic substances. Seventeen thousand drums containing chemical waste were deposited there along with more than one million gallons of hazardous bulk liquid. Because of the extent of contamination, the EPA ranked the Lone Pine site as number fifteen on the Superfund National Priority List. *See* 40 C.F.R. 300 (1985); Appendix B.

In 1981 and 1982, New Jersey and the EPA undertook various studies and investigations to determine whether the conditions at Lone Pine posed a threat to public health. On July 6, 1982, the EPA sent letters to fourteen firms informing each that it "may be a responsible party" with respect to the releases of hazardous substances at the landfill. An additional company received similar notice on September 3, 1982. Eventually, the EPA determined that as many as 142 entities might be responsible parties.

In an effort to select "an appropriate response action", each of the 15 companies was asked to "perform a feasibility study" to determine remedial alternatives for Lone Pine. When none of the companies offered to clean up the site, the EPA held a public meeting on September 16, 1982 to discuss its proposed plans and to consider further testing. In the Spring of 1983, five companies formed the Lone Pine Steering Committee to evaluate conditions at the landfill and, if necessary, to develop and implement remedial action. Soon afterwards, the EPA released for comment a three volume "Draft Feasibility Study" of remedial possibilities. The study contained five alternatives, ranging from no action to complete excavation and removal of the contaminants.

Another public meeting was held on June 24, 1983. Counsel for the Steering Committee was present and participated in the discussion. The EPA expressed preference for a proposal which required the placement of a clay cap over the landfill, the construction of an underground slurry wall around the site, and the pumping and treatment of contaminated groundwater lying within the wall.

Several days later, the Committee took exception to the EPA's proposal, contending that the slurry wall and the treatment system were superfluous. The Committee suggested a clay cap and a monitoring program to detect conditions that might make

further response necessary. The EPA rejected this proposal as inadequate. Observing that capping will "significantly reduce the net influx of contaminates to the river", the EPA nevertheless concluded that measure alone could not prevent contaminants from seeping into the underground water supply.

The comment period was extended, and another public meeting was scheduled. Five companies submitted comments to the EPA as did local citizens. The EPA met with the Steering Committee and two corporations during the next twelve months and, in June 1984, released a supplemental feasibility study.

A public meeting was held on August 1, 1984, at which time the Steering Committee reoffered its proposal. The EPA again expressed a preference for its original plan, which included the slurry wall, the clay cap, and the treatment system.

On September 12, 1984, the EPA sent notices to approximately 142 companies including the plaintiffs, notifying them of their statutory right to undertake the construction proposed by the agency. If a company was unwilling to pay for all or a part of the cost, the EPA advised that it would use federal funds to clean up the site and would sue for reimbursement. The companies were directed to respond by September 26, 1984. Several did, but none offered to perform any part of the EPA's construction plan.

The Committee resubmitted its plan, stating in a letter that its alternative "could form the basis for a negotiated settlement" which "could be implemented without the expenditure" of public funds. The Committee reiterated its position that financial responsibility "must be shared by all parties who operated, used, or whose wastes were disposed of at Lone Pine." In addition, the letter noted that the remedial plan "should not be viewed as a commitment to undertake this program in the absence of" a negotiated settlement "by all responsible parties (whether or not identified to date by the EPA)."

Two days later, on September 28, 1984, the EPA Assistant Administrator signed a Record of Decision, a 434 page document, adopting the EPA's plan for a slurry wall, a clay cap, and extraction wells. EPA also decided to perform further studies to determine if additional steps were required.

On October 30, 1984, the Committee filed this declaratory judgment action, alleging that the EPA's plan was too costly, the agency had failed to evaluate adequately the Committee's proposal, and the Record of Decision contained inaccurate technical data and erroneous assumptions resulting in duplicative and unnecessary corrective measures. The EPA moved to dismiss the suit for lack of pre-enforcement jurisdiction.

While the motion was pending, the Committee offered to install the clay cap, with the remainder of the project to be performed by the EPA. The agency rejected that proposal, citing difficulties in coordination and assessment of responsibilities, but offered to meet with the Committee for further discussions.

The district court granted the motion to dismiss, holding that the statutory language and legislative history of the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA) reveal that Congress did not contemplate pre-enforcement judicial review of the EPA's decision to implement response action.[1] "To allow judicial review of an [order] by an entity which may (or may not) be the subject of a subsequent recovery action would frustrate Congress' intent to provide a mechanism whereby hazardous sites can be neutralized expeditiously." 600 F.Supp. at 1494–95.

The court observed that "Congress intended to empower EPA to take prompt action without the delays associated with litigation." The fact that remedial actions

---

1. The district court's opinion is reported at *Lone Pine Steering Committee v. United States, E.P.A.,* 600 F.Supp. 1487 (D.N.J.1985).

may require time for planning and study does not change the picture. "Just because unavoidable delays are required to plan and implement a response does not mean that Congress contemplated the additional delays which judicial review would entail." *Id.* at 1498.

The court concluded that every objection plaintiffs "could legitimately raise in a judicial proceeding at this time" could be asserted in a cost recovery action under § 107 of the Act. Hence, if some of the measures which the EPA proposed were not cost effective, recovery for those items would be denied.[2]

On appeal, plaintiffs contend that they will be prejudiced in a post hoc recovery action because it will be impossible at that time to show that the response action was excessive. If the EPA's remedial action is effective, plaintiffs will not be able to demonstrate that their less comprehensive proposal would also have been adequate for the task. To that extent, the remedial measures would destroy the evidence which plaintiffs require. Thus they argue that in a practical sense the recovery action does not provide adequate review. Moreover, they assert that denial of pre-enforcement judicial scrutiny is not justified because the EPA has conceded that no emergency action is required at the Lone Pine landfill.

In response, the EPA urges that Congress intended to preclude pre-cost recovery review of all response actions—removal as well as remedial measures. *See* 42 U.S.C. § 9601(25). The agency also asserts that no deprivation of the plaintiffs' property interest can occur before the completion of a cost recovery suit. In that litigation, plaintiff will have the opportunity to raise the issues of cost effectiveness and statutory compliance as defenses.

We begin with the general proposition that parties aggrieved by final agency rulings shall have access to the courts. "[J]udicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe such was the purpose of Congress." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). *See also Block v. Community Nutrition Institute,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). In some instances, however, particularly when the public health is threatened, an administrative agency is permitted to act first and litigate later.

*Hodel v. Virginia Surface Mining & Reclamation Ass'n.,* 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981), upheld the government's right under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 *et seq.,* to order cessation of a mining operation when it created a danger to public health or threatened significant and imminent environmental damage. The Court found that this provision, which allowed the affected company to contest the government's action after mining had ceased, satisfied constitutional requirements. "It is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient ... that there is at some stage an opportunity for a hearing and a judicial determination." *Id.* 452 U.S. at 303, 101 S.Ct. at 2374, quoting *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 599, 70 S.Ct. 870, 872, 94 L.Ed. 1088 (1950).

The latter case sustained the government's right under the Food, Drug, and Cosmetic Act to seize a misbranded food supplement before a judicial determination was made. *See also Pharmadyne Laboratories, Inc. v. Kennedy,* 596 F.2d 568 (3d Cir.1979) (district court lacked jurisdiction to enjoin the FDA from seizing allegedly adulterated drugs); *Bethlehem Steel Corp. v. EPA,* 669 F.2d 903 (3d Cir.1982) (despite accrual of daily penalties, party challenging non-compliance order must complete administrative proceeding before seeking judicial review).

---

**2.** The same considerations which led the court to find a lack of jurisdiction under the Superfund Act also caused it to hold that adoption of the Record of Decision was not appealable under the Administrative Procedure Act. 600 F.Supp. at 1499 n. 2.

▪ In property deprivation cases, due process does not require access to the courts before final administrative action. Likewise, a statute, at least in a public health area, may prohibit pre-enforcement judicial review.

CERCLA was enacted in response to concerns about the danger to public health presented by hazardous waste sites and the slow reaction by the EPA to solve the problem. Congress wanted the parties responsible for the hazardous conditions to perform the abatement. However, because cooperation is often difficult or impossible to obtain, Congress empowered the EPA to take clean up action when necessary.

The EPA was directed to compile a list of sites to be designated as the "Top Priority Among Known Response Targets." 42 U.S.C. § 9605(8)(B). After placing a site on the list, the EPA investigates the potential threat to the public posed by the waste materials. On finding that some type of response action is required, the EPA has three alternatives. It may:

(1) issue an administrative order, enforceable through fines of up to $5,000 per day, directing a responsible party to implement either removal or remedial action, 42 U.S.C. § 9606; or

(2) apply for an injunction in the district court to compel the responsible party to clean up or abate the actual or threatened release, 42 U.S.C. § 9606; or

(3) perform the work itself and sue the responsible party for reimbursement, 42 U.S.C. §§ 9604, 9607.

In this case, the EPA chose the last option.

Section 9604(a), (§ 104(a) of the Act), provides that whenever any hazardous substance is released into the environment or there is a substantial threat of such release, the President (who has delegated the authority to the EPA) may "act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, ... unless the President determines that such removal and remedial action will be done properly by the owner ... or by any other responsible par-

ty." See 40 C.F.R. § 300 (1985) (The National Contingency Plan).

Section 9607 provides that the responsible party "shall be liable for ... all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the National Contingency Plan." That provision requires that the remedial action be "cost effective." See 42 U.S.C. § 9604(d); see also 1980 U.S. Code Cong. & Ad.News 9116, 9132.

CERCLA does not set out differing limitations on removal or remedial activities. Although plaintiffs assert that the remedial action contemplated here could be performed as litigation continues, that may not always be true in other situations. The legal question of when judicial review is available should not depend on the peculiar facts of each case. In addition, if the response work proceeds during the course of litigation, there is a strong possibility that shifting circumstances will make a final determination by a court difficult. Particularly, this might be so when engineering considerations become major factors. The district courts should not be required to become construction supervisors.

It is significant that § 9604 permits the EPA to proceed without an express determination identifying the responsible parties. Circumstances may arise in which the finding of liability could not be reached until after lengthy judicial proceedings. In the meanwhile, a threat to public health and environment might evolve into actual harm and existing damages might increase. That scenario is present here. The EPA has listed more than 142 companies as possible responsible parties. Some have already denied liability and others, no doubt, will not agree to expend sizeable sums until a court decides the issue. To delay remedial action until the liability situation is unscrambled would be inconsistent with the statutory plan to promptly eliminate the sources of danger to health and environment.

▪ The statutory approach to the problem of hazardous waste is inconsistent with

the delay that would accompany pre-enforcement review. Thus, although not explicitly stated in the statute, we find in § 9604 an implicit disapproval of pre-enforcement judicial review. That policy decision is not limited to emergency situations but applies to remedial actions as well.

Section 9607 provides an adequate opportunity for the alleged responsible parties to object to the cost and adequacy of response actions. Plaintiffs here contend they may be at a disadvantage in contesting the extent of the remedy after the fact, but we do not find that to be a constitutional deficiency. It is a problem shared with defendants in many civil actions where damages are sought. Indeed, we believe that alleged responsible parties under the statute may be in a somewhat better position to mitigate damages than a defendant in the routine civil case.

Under § 9604, the EPA has an obligation to work with the responsible parties in developing appropriate measures. The courts are not unaware of bureaucratic excesses and will undoubtedly look carefully at the claims made by the government when suit for reimbursement is brought under § 9607. We note that the Steering Committee has been consulted by the EPA throughout these proceedings, has secured its own cost estimates of proposed work, and has submitted plans to do some of the project. We assume all of these matters have or will become part of the agency record.

Even if judicial review is limited to the agency record, a matter we explicitly do not decide here, plaintiffs are in a position to contribute to that record. They can observe the remedial project, submit pertinent comments or objections as the work progresses, and prepare for the § 9607 suit. Continued monitoring of the EPA by the alleged responsible parties and the prospect of a § 9607 trial are adequate

safeguards to insure that the agency gives serious consideration to objections and comments by the parties. The reimbursement trial will not be a pro forma proceeding but will permit presentation of adequate evidence for careful and exacting study by the court. The statute requires the EPA to observe cost effectiveness, and that mandate is a limitation, not a license to squander. We expect the recovery trial to utilize that approach.

We observe further that the financial impact is felt immediately in § 9601 cases, when the responsible parties are directed to abate a hazardous condition. However, when action is taken under § 9604, as in this case, there is no actual property deprivation until after the suit for reimbursement. For that reason also, deferral of judicial review to that time is defensible.

The district court also relied on the legislative history particularly the comments in the Senate report emphasizing that "delay will often exacerbate an already serious situation" and that "it is preferable to err on the side of protecting public health, welfare and the environment in administering the response authority of the fund." S.Rep. 848, 96th Cong., 2d Sess., 56 (1980), *reprinted in* A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 at 363. We agree with the district court, and conclude that the legislative history of CERCLA illustrates that Congress intended to preclude pre-cost recovery judicial review.[3]

In holding that pre-response judicial review is not available in a § 9604 case, we are in agreement with the Court of Appeals for the Sixth Circuit. In *J.V. Peters & Co., Inc. v. Administrator, E.P.A.,* 767 F.2d 263 (6th Cir.1985), the court pointed out that Congress is considering legislation to revise CERCLA, including amendments specifically denying jurisdiction to consider

**3.** In submitting a report on a bill to amend CERCLA, the Senate Committee on Environment and Public Works stated the district court's opinion in this case correctly determined that pre-enforcement review was barred. Su-

perfund Improvement Act of 1985, Report of the Committee on Environment and Public Works to Accompany S. 51, 99th Cong., 1st Sess., Report No. 99–11, March 18, 1985.

pre-enforcement challenges to the EPA response actions. Although the bills in the Senate and House contain similar language, we do not rely on them since they have not been approved by both Houses. We note, nonetheless, that the proposed legislation and its legislative history are instructive on the question of pre-enforcement judicial review. *See* H.R. 2005, 99th Cong., 1st Sess., 131 Cong.Rec. S 12184, 12197 (1985). *Cf. Taylor v. United States*, 749 F.2d 171 (3d Cir.1984) (Even though the President declined to sign a bill into law, we found its language and legislative history persuasive as expression of congressional intent).

Several district courts have also found no jurisdiction for pre-enforcement review. *See, e.g., Wagner Electric Corp. v. Thomas*, 612 F.Supp. 736 (D.Kans.1985); *Aminoil, Inc. v. United States, E.P.A.*, 599 F.Supp. 69 (C.D.Cal.1984).

Plaintiffs rely on *Outboard Marine Corp. v. Thomas*, 773 F.2d 883 (7th Cir. 1985), but that case is distinguishable. In *Outboard*, the EPA sought to gain access to the company's property to perform preliminary design work in preparation for the actual remedial construction. The company asked the district court to enjoin the EPA from executing a warrant for entry and investigation. The court denied the company's request. The court of appeals reversed, concluding that § 9604 does not empower the agency to enter private property to conduct investigations in non-emergency situations.

We conclude that the district court properly denied the plaintiffs' request for an injunction to prohibit the EPA from taking remedial action under § 9604. Although we recognize the importance of judicial review of agency action, we are persuaded that the purpose of the statute would be frustrated if review is allowed at this stage. Accordingly, the judgment of the district court will be affirmed.[4]

---

4. Plaintiffs also contend that the EPA has not complied with the National Environmental Protection Act (NEPA). The district court concluded that plaintiffs lack standing because their interest in general environmental concerns was neither pleaded nor demonstrated. Their professed interests were limited to potential financial liability for the remedial action. We find no error in the district court's disposition of this issue. In addition, we have considered the plaintiffs' other contentions and have found them unpersuasive.