OUTBOARD MARINE
CORPORATION, Plaintiff,

v.

Lee M. THOMAS, Administrator of the United States Environmental Protection Agency, and the United States Environmental Protection Agency, Defendants.

No. 85 C 3287.

United States District Court,
N.D. Illinois, E.D.

April 30, 1985.

**1236**

Jan Feldman, of Phelan, Pope & John, Ltd., Richard J. Kissel, of Martin, Craig, Chester & Sonnenschein, Chicago, Ill., for plaintiff.

James T. Hynes, Chief, Civ. Div., Asst. U.S. Atty., Chicago, Ill., Karen L. Florini, Land and Natural Resources Div., Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action is before the court in part on appeal from the March 20, 1985 order of Magistrate Joan Lefkow issued in the case of *In the Matter of Outboard Marine Corporation*, No. 85 M 030. 28 U.S.C. § 636(b)(3); *General Rules of the United States District Court, Northern District of Illinois* 2.44. The complaint also seeks a preliminary injunction. As no fact-finding hearing has yet been convened, the court must assume as true all well-pleaded allegations in the complaint. For the rea-sons stated below, the motions for preliminary injunction and for reversal of the Magistrate's order are denied.

### Factual Allegations

This action concerns the efforts of the Environmental Protection Agency ("EPA") and its Administrator, Lee M. Thomas, to remedy the problem of polychlorinated biphenyl ("PCB") contamination of Waukegan Harbor and surrounding areas of Waukegan, Illinois. The Outboard Marine Corporation ("OMC") owns an industrial complex on property near Waukegan Harbor. (Complaint ¶ 12.) The EPA has charged that OMC is responsible for the presence of PCBs in a drainage ditch and a parking lot on OMC's property (the "North Property"). (*Id.* at ¶ 16.) The EPA has further charged that OMC is responsible for PCB contamination of property not owned by OMC, specifically the Upper Harbor and Slip No. 3 of Waukegan Harbor. (*Id.*) Waukegan Harbor is a navigable body of water servicing several industries and recreational docking facilities. (*Id.* at ¶ 15.)

Over the past several years, the EPA has sought ways to address the problem of PCB contamination in Waukegan Harbor and on OMC property. It first sought relief under various federal statutes, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601–9657 ("CERCLA"), in a suit pending before this court, *United States v. Outboard Marine Corporation, et al.*, 78 C 1004. On February 6, 1985, this court granted EPA's motion voluntarily to dismiss that action. The dismissal, however, was without prejudice to the EPA's rights to conduct its own remedial response to the contamination under CERCLA § 104, 42 U.S.C. § 9604, and to sue those responsible for the contamination under CERCLA § 107, 42 U.S.C. § 9607.

Allegedly acting under the authority of CERCLA § 104, the EPA is now attempting to clean up the PCBs in the North Property and Waukegan Harbor. The first phase of this cleanup involves access to OMC's property in order to conduct field

investigations necessary for the design of the remedy. Specifically, this phase ("Phase 1") contemplates a walk-through design visit to the Waukegan Harbor Hazardous Waste Site, as well as a surveying visit and a subsurface investigation visit (requiring about 23 soil-borings). The EPA estimates that these visits should take no more than 70 days. The walk-through visit will involve at least 16 persons and 7 vehicles; the surveying at least 3 persons and 1 vehicle; and the subsurface investigation at least 17 persons and 16 vehicles. (*Id.* at ¶¶ 45–48 and Exhibit A.) With regard to Phase 1, OMC claims:

> The activities EPA seeks to perform under its warrant will cause substantial disruptions to OMC's operations by impeding OMC's access to its parking lot, plants and all of the Harbor-front property. The presence of EPA workers dressed in protective garb will have an adverse psychological impact on OMC's employees.

(*Id.* at ¶ 48.)

OMC also complains of Phase 2 of the EPA's planned action, which constitutes the actual remedy for the contamination. According to OMC, the EPA's remedial plan would seriously intrude on OMC's property. Specifically, the EPA plans to implement a dredging and removal action at a cost of $21 million and a duration of 3½ years. (*Id.* at ¶¶ 26–31.) This action would involve, among other things, the removal of sediments from the North Property and Slip No. 3 and the treatment of those sediments in lagoons that will be constructed on OMC property. The site chosen for the lagoons is known as the "Harbor-front Property," a thirty-acre property owned by OMC which is not contaminated with PCBs. (*Id.* at ¶¶ 27–28.) Additionally, the EPA proposes to store the treated PCBs permanently on OMC's parking lot (part of the North Property) in a six-acre "containment cell" to be built by the EPA. (*Id.* at ¶ 29.)

Exhibit G of the complaint, a "Conceptual Site Layout" prepared by the EPA, shows the proposed locations of the structures, such as the lagoons and the containment cell, to be built on OMC's North and Harbor-front Properties. OMC alleges that the removal operations will release PCBs into the air and water of and around Waukegan Harbor; require nearly 100 daily truck-trips on OMC's property; eliminate the water intake necessary to OMC's operations; damage OMC's utility lines and data processing facilities; cause psychological harm to OMC's more than 2,000 employees; render useless 30 acres of OMC's property during the operations; and contaminate OMC's Harbor-front Property.

According to the complaint, on February 13, 1985, EPA agents obtained an administrative warrant in an *ex parte* application to Magistrate Lefkow. The warrant, attached as Exhibit B to the complaint, authorized the EPA to enter the Waukegan, Illinois property of the Outboard Marine Company ("OMC") in order to conduct the Phase 1 activities described above. The warrant does not allow the EPA access to OMC property for purposes of carrying out Phase 2. At the April 24, 1984 status hearing before this court on this matter, the EPA stated that it could not use a warrant to gain entry for Phase 2. EPA's attorney stated that some sort of equitable action in federal district court would be used to gain this type of access.

In the warrant proceedings, Magistrate Lefkow considered the affidavits of EPA employees Rodney Lynn and Danial M. Caplice as evidence that a release or threatened release of a hazardous substance had occurred on the OMC premises in Waukegan. The Magistrate further found that representatives of OMC had refused EPA agents access to the OMC premises for purposes of conducting Phase 1 activities. (The EPA concedes that the access is not designed to investigate whether a violation of law did or is about to take place, or to determine whether OMC is in compliance with the law.) After making such findings, the Magistrate found authority for the contemplated entry in CERCLA § 104, and granted the warrant for the limited purpose of conducting Phase 1 activities.

On February 14, 1985, the day after the warrant issued, EPA agents sought

entry to OMC property in Waukegan. Also on that day, OMC moved to quash the warrant. In a written opinion attached as Exhibit C to the complaint, the Magistrate denied the motion to quash on March 20, 1985. On March 21, 1985, OMC filed an emergency appeal of the ruling on the motion to quash, pursuant to Local Rule 2.44. A stay of the warrant was issued by the Emergency Judge, Chief Judge Frank McGarr, on March 21, 1985. On April 8, 1985, the present complaint for injunctive relief and for an appeal was filed. District courts have jurisdiction to review the decision of a magistrate to issue a warrant. *General Rules, supra,* at 2.44; *Weyerhaeuser Co. v. Marshall,* 592 F.2d 373, 377 (7th Cir.1979); *In the Matter of Sauget Industrial Research and Waste Treatment Association v. Marshall,* 477 F.Supp. 88, 90 (S.D.Ill.1979).

In Count I of its complaint, OMC contends that conduct of Phase 1 or Phase 2 activities on its property without authority granted by condemnation proceedings constitutes an uncompensated taking of its property and a deprivation of property without due process of law, both in violation of the fifth amendment to the federal constitution. In Count II, OMC claims that issuance of the warrant violated the federal fourth amendment, as it was issued without a finding of probable cause and in an *ex parte* hearing. As such, the warrant constituted an unreasonable search and seizure. These alleged constitutional violations have and continue irreparably to harm it. Moreover, OMC alleges other damages, such as loss of business, will result from the warrant and harm it irreparably. As relief, OMC requests the court to issue an order:

1. Quashing the warrant issued February 13, 1985;

2. Enjoining the EPA and Thomas from executing said warrant;

3. Reversing the Magistrate's March 20, 1985 ruling that denied Outboard Marine Corporation's motion to quash the warrant; and

4. Granting OMC such other and further relief as the Court deems proper.

(Complaint fol. ¶¶ 60, 70.)

### Applicable CERCLA Provisions

CERCLA was designed to remedy hazardous waste sites, specifically abandoned or "orphan" dump sites. *United States v. Wade,* 546 F.Supp. 785, 792 (E.D.Pa.1982), *appeal dismissed,* 713 F.2d 49 (3d Cir. 1983). It gives the EPA broad powers to clean up such sites. Section 104, the provision under which the EPA justifies its present actions, provides that whenever any hazardous substance is released, or there is a substantial threat of release,

> the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance ... at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment, unless the President determines that such removal and remedial action will be done properly by the owner of the ... facility from which the release ... emanates....

CERCLA § 104(a), 42 U.S.C. § 9604(a). Subsection (b) of § 104 provides that when the President is authorized to act under subsection (a),

> he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release.... In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

Subsection (e) establishes a right of access to a facility from which a release has ema-

nated or is emanating for purposes of inspecting records and taking samples. Such access must be allowed to the President or his agents upon his request.

■ CERCLA's definitions make clear that the activities described above as response, remedial, and removal necessarily include entry on the waste site. To "respond" means to engage in actions defined as removal or remedial. CERCLA § 101(25); 42 U.S.C. § 9601(25). To "remove" means to clean up or remove and to dispose of the released substance. CERCLA § 101(23), 42 U.S.C. § 9601(23). The definition of "remove" continues:

> The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, [etc.]

*Id.* "Remedy" or "remedial action" includes actions consistent with a permanent remedy, which may be taken in addition to or instead of removal. CERCLA § 101(24); 42 U.S.C. § 9601(24); *Lone Pine Steering Committee v. United States Equal Protection Agency*, 600 F.Supp. 1487, 1498 (D.N. J.1985) (removal v. remedy). For purposes of CERCLA, "remedy" includes, but is not limited to,

> such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances ... recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment and incineration, [etc.]

■ After responding to a waste site, the EPA may seek reimbursement for the costs of the response action from the responsible party. CERCLA § 107, 42 U.S.C. § 9607. It is clear from the statute that judicial review of the EPA's decision to respond to a waste site can be had only after the response action is commenced or completed. *United States v. Outboard*

*Marine Corp.*, 104 F.R.D. 405, 411 (N.D.Ill. 1984); *Lone Star*, 600 F.Supp. at 1495; *Aminoil, Inc. v. United States Equal Protection Agency*, 599 F.Supp. 69, 71 (C.D. Cal.1984). The statute is designed to allow the EPA to respond quickly to a hazardous waste site, and to impose liability later only after a full hearing and review of the EPA's actions.

### Discussion

While OMC's allegations refer to both Phases 1 and 2 of the EPA's response action, the court finds that the present action for preliminary injunctive relief concerns only the imminent Phase 1 activities. Even had the EPA not conceded in court that Phase 2 activities could be undertaken only with court order—at least in a case such as this involving private property on which business activities are conducted—the warrant that OMC asks the court to quash permits access only for Phase 1 activities. Moreover, the EPA is not now seeking access for Phase 2 activities, and hence preliminary injunctive relief is not appropriate. Declaratory relief may be the appropriate vehicle regarding the EPA's power to carry out Phase 2; yet, a request for such a declaration may be premature in light of the EPA's admission that a court order is necessary therefor. In any event, the propriety of such a declaration regarding Phase 2 need not be examined on the expedited schedule necessary regarding the imminent Phase 1 activities.

For purposes of this motion, and accepting as true OMC's factual allegations, the court will assume that the activities of Phase 1 would constitute a "taking" such that the fifth amendment's requirement of "just compensation" is triggered. U.S. Const. amend. V; Tucker Act, 28 U.S.C. §§ 1346, 1491; *see generally Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (discussing fifth amendment implications of permanent and temporary physical invasions of real property). The court will also assume that Phase 1 will entail a deprivation of property, such that the due pro-

cess requirements of the fifth amendment are implicated.

## A. Taking Without Just Compensation

■■ As mentioned above, the court assumes for this motion only that Phase 1 will entail a taking of OMC property. However, it is clear that the fifth amendment prohibits only takings without just compensation or for a non-public use. Where just compensation is provided, the takings clause is not violated. *Larson v. Domestic & Foreign Commerce Corporation,* 337 U.S. 682, 697 & n. 18, 69 S.Ct. 1457, 1465 & n. 18, 93 L.Ed. 1628 (1949). The Supreme Court has clearly indicated that

> [e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking.... The Fifth Amendment does not require that compensation precede the taking.

*Ruckelshaus v. Monsanto Co.,* —— U.S. ——, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984) (footnote and citations omitted). The parties accept the principle that the Tucker Act allows an action in the Claims Court in which compensation for an authorized taking is sought. The availability of the Tucker Act remedy is presumed, upon a showing of the above-mentioned factors (that the action was authorized and for a public use), unless Congress has manifested an intent to withdraw that remedy. *Id.* at 2881. OMC does not cite to any statutory provision of legislative history demonstrating such a withdrawal here. The court finds none in its own examination of the statute. Congressional failure to mention or allow recourse to the government for compensation alone cannot "reflect an unambiguous intention to withdraw the Tucker Act remedy." *Ruckelshaus,* 104 S.Ct. at 2882. Hence, if otherwise proper,

the taking contemplated here is compensable under the Tucker Act.

OMC additionally does not argue that the taking is for a private use. Considering the broad definition of public use—which is basically coterminus with the sovereign's police powers, *Hawaii Housing Authority v. Midkiff,* —— U.S. ——, 104 S.Ct. 2321, 2329, 81 L.Ed.2d 186 (1984); *Ruckelshaus,* 104 S.Ct. at 2879—such an argument on the present allegations would be unavailing.

■ OMC does vigorously assert, however, that the court may enjoin the Phase 1 activities. This conclusion rests on two independent arguments. First, as the taking is unauthorized, according to OMC, no compensation would be allowed therefor under the Tucker Act. Hence, to allow the EPA to conduct Phase 1 activities would effectually sanction an uncompensated taking by the EPA. Since it is clear that principles of sovereign immunity are not offended by court-ordered specific relief against activities by federal officials that are *ultra vires* (outside the scope of their statutory authority or conducted pursuant to an unconstitutional statute), an injunction is an appropriate remedy in this case. *United States v. Lee,* 106 U.S. 196, 219–20, 1 S.Ct. 240, 259–60, 27 L.Ed. 171 (1882); *Larson v. Domestic & Foreign Commerce Co.,* 337 U.S. 682, 695–97, 69 S.Ct. 1457, 1464–65, 93 L.Ed. 1628 (1949); *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1522 (D.C.Cir.1984), *petition for cert. filed,* 53 U.S.L.W. 3671 (March 4, 1985) * (No. 84–1398). Second, a monetary remedy would not sufficiently compensate OMC for the taking.

The court rejects the second argument, regarding the inadequacy of monetary compensation. The principle behind this argument is supported by the majority *en banc* decision of the District of Columbia Circuit

---

* On May 20, 1985, after this opinion was issued, the United States Supreme Court granted the petition for a writ of certiorari and summarily vacated the judgment. —— U.S. ——, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). The Court remanded the case to the District of Columbia Circuit "for reconsideration of its opinion and judg-

ment in light of the Foreign Assistance and Related Programs Appropriations Act (Continuing Appropriations, 1985—Comprehensive Crime Control Act of 1984), Pub.L. No. 98–473 Section 127 and other events occurring since October 5, 1984."

in *Ramirez*. However, even accepting the principle enunciated in *Ramirez*, the court finds the present allegations insufficient to support injunctive relief based on inadequacy of remedy.

In *Ramirez*, the government had seized a substantial portion of land owned by a United States citizen in Honduras. The land was converted into a military base for purposes of military training. In addition to the expropriation of the land, the government conducted activities such as military exercises and the firing of weapons. Several head of cattle were shot by stray bullets. The landowners and their employees, living on the remaining portion of the land, felt their lives endangered by these activities. In finding that the activities should be enjoined preliminarily, the Court discussed the availability of a Tucker Act remedy. Assuming that such a remedy was available, the Court noted that its adequacy was also an issue:

> It is clear ... that when the monetary compensation available through the Tucker Act is so inadequate that the plaintiff would not be justly compensated for the seizure of his property by the United States, an injunctive remedy is not barred by sovereign immunity.... Other decisions ... assume either explicitly or implicitly that the *adequacy* of the Tucker Act remedy is an issue; and that the gross inadequacy of money damages could justify injunctive relief when money alone would not constitute just compensation.

*Ramirez*, 745 F.2d at 1527 (footnote omitted and emphasis original). In effect, the Court ties the definition of "just compensation" to the adequacy of monetary compensation. This court can conceive of situations in which no amount of monetary compensation would be constitutionally sufficient. *Ramirez* might be such a case, where the taking of property involved endangering human life. Yet, these situations are few; the test for inadequacy of the legal remedy for eminent domain purposes is not coextensive with that for general equitable purposes. To hold otherwise would severely limit the scope of the United States' eminent domain power. As the

dissenting opinion in *Ramirez* pointed out: "When monetary compensation would not constitute 'just compensation,' the taking could not be effected." *Id.* at 1552.

While OMC may have a stronger argument at Phase 2—where PCB's arguably would be released and could endanger the health of OMC workers—that monetary compensation is unconstitutionally inadequate, that argument does not succeed at Phase 1. Accepting as true OMC's allegations concerning the harms connected to Phase 1, all are economic in nature. The Tucker Act remedy would satisfy fully the commands of the fifth amendment.

OMC's other argument is that the unauthorized nature of the EPA's actions would render the Tucker Act unavailable. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), establishes that Executive power must stem "either from an act of Congress or from the Constitution itself." *Id.* at 585, 72 S.Ct. at 866. The EPA does not argue a right of entry stems from the constitution. Rather, it claims that provisions of CERCLA authorize its Phase 1 activities.

Statutory provision for exercise of the power of eminent domain need not state explicitly that such power may be exercised. Rather, the statute must authorize the action from which a taking may stem. *Cf. Ruckelshaus*, 104 S.Ct. at 2880 & n. 19. The District of Columbia Circuit, in a case on which OMC relies heavily, explains the test as follows:

> Whether an action of Executive officials is sufficiently authorized by congressional or constitutional provision to permit a claim under the Tucker Act depends upon the nature of the facts of the particular case and the scope of the defendants' lawful powers. Not all illegal acts of government officials are considered unauthorized for the purpose of determining the government's liability to pay compensation under the Tucker Act. The question in each case is whether the defendants' actions are substantially in compliance with the powers granted to them by congressional statute

or constitutional provisions. Recovery under the Tucker Act has been permitted when a taking by an officer is a natural consequence of congressionally approved measures or the result of an exercise of discretion granted to an official for the implementation of a congressional statute.

However, when an officer acts wholly outside the scope of [these powers], the official's actions have been considered to be unauthorized for the purposes of a damages remedy under the Tucker Act.

*Ramirez,* 745 F.2d at 1523 (footnotes omitted).

■■■■ Acting without statutory power at all, or misapplying one's statutory power, will result in a finding that such action was *ultra vires.* It is clear additionally that acting without constitutional authority will support a denial of a Tucker Act remedy. *Id.* at 1522–23; *see also id.* at 1551 n. 3 and 1554 ("the question whether a government officer was acting sufficiently within his authorized powers to permit a Tucker Act remedy is precisely the same as the question whether he was acting sufficiently within his powers to preclude injunctive relief against him") (dissenting opinion of Judges Scalia, Bork, and Starr). Regarding the claim that the contemplated action is unauthorized, therefore, the court must ask whether the intended action is authorized by statute or constitution.

In this case, the EPA is seeking entry to OMC's property. Regarding statutory right of entry, the EPA first argues that subsection (e) specifically allows a right of entry for Phase 1 activities. The court accepts OMC's argument that § 104(e) concerns only entry for the examination of records and taking of samples. OMC argues further that the absence of a right of entry in § 104(b) (allowing for planning investigations) coupled with the reference to such a right in § 104(e) establishes that CERCLA provided no right of entry for on-site inspections and response actions.

The absence of a reference to right of entry in § 104(b) does not strike the court as significant. Inspection of records and documents can be accomplished without entry, such as through the less intrusive administrative subpoena duces tecum. At least one court has found that a provision allowing "access" to documents but not entry for purposes of examining documents, did not allow the enforcement agency to obtain a search warrant for purposes of entering the premises and inspecting the documents. *Midwest Growers Co-Op Corp. v. Kirkemo,* 533 F.2d 455, 462 (9th Cir.1976) (agency must follow congressionally established injunctive proceeding in order to gain access to records). Unlike inspection of documents, inspection of physical premises cannot be accomplished through administrative subpoena. Thus, there is a legitimate distinction between searches under § 104(b) and (e) justifying the latter subsection's explicit reference to the right of "entry."

Having determined that § 104(e)'s reference to entry does not preclude inferring a right of entry under § 104(b), the court must examine whether the statute supports such an inference. The scope of remedial and removal actions that comprise permissible response actions, as described in § 101, necessarily includes access to the waste site. In addition, violation-detecting investigations (including surveys and monitoring) and response-planning investigations require access to the site. OMC does not argue that the statute was designed to remedy only government-owned sites. While the statute addresses the problem of abandoned sites, many of them will be on privately-owned property. The fact that the OMC site is privately owned and still occupied, then, does not take it out of CERCLA's scope.

■■■■ The scope of response actions coupled with the presumption that waste sites will in many cases be privately owned, therefore, persuade the court that CERCLA allows the EPA entry to a privately-owned site for purposes of investigation and response. The statute is silent, however, on the mechanism by which access is to be achieved. Subsection (e) provides that access must be allowed on demand,

but no similarly descriptive language exists in § 104(a) or (b).

The court's own research reveals no case exactly on point. Of the many reported CERCLA decisions, most do not involve a waste site on which the owner is conducting business. This may explain the lack of precedent on the issue of EPA access to private property. The closest case factually is *Industrial Park Development Company v. Environmental Protection Agency*, 604 F.Supp. 1136 (E.D.Pa.1985), since it concerns a dispute by the EPA and the property owner over which should conduct cleanup activities. In that case, it appears that the EPA simply entered the land, without warrant or judicially-granted authority. However, the case is not legally helpful.

Courts have addressed the issue of an administrative agency's remedy where a statute allows a right of entry but provides no mechanism to accomplish it. The Ninth Circuit has held that where a statute provides a right of entry, an *ex parte* administrative warrant may be used to obtain entry. *Midwest*, 533 F.2d at 462; *Bunker Hill Company Lead and Zinc Smelter v. U.S. Environmental Protection Agency*, 658 F.2d 1280, 1285 (9th Cir.1981); *In re Order Pursuant to Section 3013(d) RCRA*, 550 F.Supp. 1361, 1364 (W.D.Wash. 1982). OMC relies on *Midwest* for the proposition that where a statute provides a right but not a remedy, the court may infer only a civil injunction action to enforce the right. However, in *Midwest*, a comparable provision in the same statute concerning access to records specifically provided for an injunction as the method of enforcing the right to access. Hence, congressional intent to allow only an injunction action was clearly present in that statute.

▮ These principles persuade the court that an administrative warrant may be the vehicle for conducting a violation-detection search under § 104(b). OMC next argues that a warrant is not the proper vehicle for a response-planning investigation. According to OMC, a warrant is designed to allow an investigation for a specific legal violation when supported by probable cause or for an investigation pursuant to reasonable and neutral standards for purposes of monitoring legal compliance. The court agrees that the use of a warrant to plan the response, after the violation has been established, is unusual in light of the common understanding of the purposes of a search warrant. The EPA has not provided the court, and the court's own research does not reveal, an example of a warrant being used in a situation such as this.

Yet, the Phase 1 activities do constitute a search. Moreover, Phase 1 (for which a warrant is sufficient) and Phase 2 (for which the EPA concedes a court order is necessary) are distinguishable for purposes of determining the extent of due process required before their execution. At Phase 1, the EPA will examine the feasibility of its projected cleanup; the investigation may result in a reversal of its conclusions regarding the appropriateness of Phase 2. Since warrants have issued for violation-detection searches as intrusive as the planning search desired here, *In re Order, supra*, the use of the same procedure for both types of searches is a sensible interpretation of an otherwise ambiguous statute.

This perception is supported by the court's interpretation of the issues that would be relevant in a hearing before any type of § 104(b) search. Whether the search is to plan a response or to determine the need for a response, the issues to be aired before a warrant or injunction authorizing entry are severely circumscribed by the statute. The finding of a violation and the choice of a response are issues that cannot be litigated until the cost-recovery suit, if any. The EPA may conduct any type of § 104(b) search when authorized to act under § 104(a), namely, when a hazardous substance is released. Because the EPA's determination is not subject to judicial review, the pre-search inquiry is whether the EPA has made such a determination. Thus, the type of inquiry to be made for a response-planning search is the same as that necessary for a violation-detection search. Both involve issues traditionally presented to magistrates in administrative

search warrant proceedings: allegations that a legal violation on the premises brings into play government regulatory power. In such a proceeding, the neutral magistrate takes evidence on the cause for the search (probable cause or neutral monitoring procedures), reviews the scope of the search for reasonableness, and examines the legal authority for the warrant. The warrant itself and the Magistrate's March 20, 1985 opinion denying the motion to quash reveal that these steps were followed. (See also the EPA's undisputed recitation of the evidence the Magistrate had before her in the warrant proceeding. United States' Reply, filed 4/22/85, pp. 15–16.)

■ Thus, the court agrees with the EPA's interpretation of CERCLA, to which it must grant deference, *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), that a warrant proceeding is a proper vehicle for obtaining entry under § 104(b) for all purposes. The final issue regarding statutory authorization is whether the proceeding should have been of an adversary or *ex parte* character. OMC contends that an *ex parte* hearing may only be used to obtain a warrant when administrative goals require a surprise appearance. This proposition has been rejected by at least one circuit. *Bunker Hill Company,* 658 F.2d at 1285. Again, the court agrees with the EPA that an *ex parte* proceeding was constitutionally sufficient, although an adversary proceeding would be preferable. This conclusion flows from the limited nature of the issues before the Magistrate. It is significant, additionally, that in OMC's voluminous papers, there is little indication of what evidence or arguments it would have presented to the Magistrate. OMC does note that it would have told the Magistrate that there are no PCBs on the Harbor-front Property. However, the EPA did not represent that PCBs were on that property. And, it cannot be argued that the EPA is limited in its planning investigation only to those areas contaminated by PCBs. Since the response authority includes the construction of on-site structures, the search of appropriate areas contiguous to contaminated areas, especially where the

contaminated areas are bodies of water, for purposes of such construction is proper.

The court therefore finds that CERCLA authorizes both the requested search and the procedures by which the EPA sought entry to the premises to conduct the search. Since CERCLA authorizes the use of an *ex parte* administrative warrant for purposes of carrying out its duties under § 104(b), recourse to a magistrate to obtain the warrant was also proper. 28 U.S.C. § 636(b)(3); *General Rules, supra,* at 1.70(B)(L)(M); 2.40(a). This supports the existence of a Tucker Act remedy. Hence, the takings clause does not support OMC's motion.

## B. Search and Seizure

■ Regarding the fourth amendment, the court finds that the previous discussion establishes no such violation here. OMC's allegations regarding the scope of Phase 1 establish that EPA representatives will carry out soil borings and surveying activities. The intrusion, however, is reasonable given the goal of the investigation and the public interest involved. Moreover, the Magistrate's warrant is sufficiently definite and limited in scope. At least one other court has determined that a warrant similar to that issued here is constitutionally sound. *In re Order, supra.* Finally, the warrant was issued after the Magistrate heard evidence of the contamination and the EPA's intended response action. This provided sufficient statutory authority for the search. The court therefore rejects OMC's fourth amendment argument.

## C. Deprivation of Property Without Due Process

■ The court has noted that it will assume that Phase 1 involves a deprivation of property triggering the fifth amendment's requirement of due process. The amount of process due attendant to any particular deprivation is variable. The factors to be considered are the private interest affected by the official action, the risk of erroneous deprivation of the interest through the procedures used and the probable value of additional procedures,

and the government's interest (including the fiscal and administrative burdens) that the additional requirement would entail. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Neither party has addressed the *Mathews* factors. However, the court's own examination persuades it that OMC has not shown a likelihood of success on the merits of the issue. *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380 (7th Cir. 1984).

The question is whether the *ex parte* warrant proceedings provide sufficient process for any deprivation attendant to the Phase 1 search. The court has already determined that the inquiry in a warrant proceeding under § 104(b) is limited and simple. OMC has not explained the value of an adversary proceeding for purposes of preventing an erroneous deprivation under these circumstances. Moreover, the government interest in executing the search is substantial. While the court accepts OMC's allegation that the deprivation involved in Phase 1 is substantial as well, this does not overcome a failure to explain the value of additional process. The court therefore finds a lack of likelihood of success on the merits of the fifth amendment claim. For this reason, the court will not grant an injunction based on OMC's claim of a violation of due process rights.

### Conclusion

OMC's motion for reversal and motion for preliminary injunction are denied in full. The government's motion to dismiss is taken under advisement.

It is so ordered.