773 F.2d 883
 23 ERC 1233, 54 USLW 2179, 15 Envtl.
L. Rep. 21,094
 OUTBOARD MARINE CORPORATION, Plaintiff-Appellant,
v.
Lee M. THOMAS, Administrator of the United States
Environmental Protection Agency, and the United
States Environmental Protection Agency,
Defendants-Appellees.
 No. 85-1753.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 14, 1985.
Decided Sept. 23, 1985.
 
 Richard J. Phelan, Phelan, Pope & John, Ltd., Chicago, Ill., for plaintiff-appellant.
 Anne S. Almy, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for defendants-appellees.
 Before BAUER and WOOD, Circuit Judges, and GRANT, Senior District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 The United States Environmental Protection Agency ("the EPA") has determined that there are deposits of the notorious chemical polychlorinated biphenyls, commonly known as PCBs, in certain areas of Waukegan Harbor, Illinois and an adjacent industrial complex owned by Outboard Marine Corporation ("OMC"), and that the blame lies with OMC. As a hazardous waste site, this area ranks high on the National Priority List and is the number one priority site in the State of Illinois. Even though the PCBs were discovered almost ten years ago, to date little has been accomplished. This part of the controversy is concerned with the means chosen by the EPA to finally get started with remedial action.
 
 Factual Background
 
 2
 OMC manufactures outboard motors, lawn mowers, and industrial and turf care vehicles at its industrial complex in the Waukegan Harbor area and at other locations in the United States and abroad. In addition to the manufacturing plant, OMC's Waukegan Harbor complex houses its corporate headquarters, central data processing facilities, and engineering operations.[1] Over two thousand people are employed at this site.
 
 
 3
 In 1976, the EPA announced that there were PCBs in the sediments at the bottom of Slip No. 3 and that OMC's operation was the source. Two years later the EPA brought suit against OMC, alleging that the PCBs in Slip No. 3 and in parts of OMC's North Property constituted a threat to the environment and seeking to compel OMC to remove the hazards. For the next seven years, the parties engaged in discovery which included samplings of OMC's complex and the harbor, and studies of the possible effects of PCBs. The EPA then moved to dismiss its case voluntarily. The district court, over OMC's objection, allowed the motion to dismiss without prejudice, but upon the condition that the EPA agree not to sue OMC except under the cost-recovery provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("the Act"), 42 U.S.C. Sec. 9601 et seq.[2]
 
 
 4
 The EPA is now, as permitted under the dismissal, seeking to institute its own remedial action under section 104 of the Act, 42 U.S.C. Sec. 9604, with the opportunity to seek recovery for cleanup costs from the responsible parties under section 107 of the Act, 42 U.S.C. Sec. 9607. In January, 1985, representatives of the EPA and OMC met to discuss EPA access to the OMC complex for design work purposes. In particular, the EPA sought to conduct a "walk-through" of the exterior portions of OMC's property, survey the site, set markers, and collect twenty-three soil borings. The EPA labels these preliminary activities as Phase 1, and claims that access is not presently sought for the purpose of implementing the actual remedy.
 
 
 5
 To better understand what Phase 1 amounts to, some detailed examination is necessary. The so-called "walk-through" is not a Sunday afternoon stroll. It would involve about sixteen persons and seven automobiles. The surveying would involve about three persons and one van, and the soil borings would involve about seventeen persons and sixteen vehicles. The equipment would include truck-mounted drill rigs, pickup trucks, vans, water trucks, automobiles, a waste hauler, a job trailer and possibly a bulldozer. Approximately 1,000 square feet of the parking lot would be needed to park the equipment. Survey monuments would be left in place to facilitate later construction. This EPA task force prepared to move in on OMC for a maximum of seventy days, a little over two months.
 
 
 6
 All of this is preliminary to the actual remedial operations which would involve dredging or excavating thousands of cubic yards of sediments from the harbor, north ditch and OMC parking lot, and transporting the material to the OMC Harbor front property for years of treatment in extensive lagoons and other facilities to be constructed by the EPA. Some of the remainder after treatment would be permanently housed in a fifteen-foot high "containment cell" to be built on and to occupy six acres of the OMC parking lot. It is estimated that the construction of these EPA facilities on OMC property would take three and one-half years. From oral argument it appears that the EPA, itself without the power of eminent domain, is not certain how it will proceed to gain access to accomplish its actual remedial construction. The EPA informed us that Congress is considering an amendment to grant the authority to enter for actual construction which it seems unsure about under the present statute. We need not reach that issue.
 
 
 7
 Access at this time, however, is sought only to do the necessary surveying, soil testing for weight-bearing, and design specification work in preparation for the actual construction. The EPA does not contend that an emergency exists at OMC. There is no imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance. If there is an emergency, it is almost ten years old.
 
 
 8
 This background summary brings us to the legal issue of how EPA access for Phase 1 may be obtained, and what recourse OMC may have for the threatened EPA invasion of its private property.
 
 Acquisition of Access by EPA
 
 9
 After negotiations with OMC failed to voluntarily provide EPA the access it wanted for its preconstruction purposes, the EPA applied ex parte to a United States magistrate for a warrant for entry and investigation under sections 104(a), 104(b), and 104(e) of the Act, 42 U.S.C. Sec. 9604(a),[3] (b),[4] and (e).[5] In the application for the warrant, among other things, the EPA informed the magistrate that PCBs existed at the site and that an on-site remedial response was necessary. The EPA stated it relied on section 104(e)(1) as most germane for its statutory right to enter the site to perform the field work necessary to prepare the design plans and specifications for the anticipated cleanup construction. The application recited the unsuccessful efforts to accomplish an access agreement with OMC.
 
 
 10
 On February 13, 1985, the magistrate, finding that grounds existed for an administrative entry, issued the requested warrant for the so-called Phase 1. When the EPA, armed with the warrant, appeared at OMC's door, admission was refused. After the magistrate denied OMC's motion to quash the warrant, OMC filed this suit seeking to enjoin the EPA from executing the warrant and to reverse the ruling of the magistrate denying the motion to quash the warrant. The district court, 610 F.Supp. 1234, denied OMC's motions for reversal of the magistrate's action and for a preliminary injunction, and took under advisement the EPA's motion to dismiss. The district court examined the issues and, reading the statute broadly, reasoned that since warrants have issued for violation-detection searches, which this is not, but which are as intrusive as the planning search at issue here, the use of the same or similar warrant procedure in this instance was a sensible interpretation of an otherwise ambiguous statute. Even so, the district court considered the use of the warrant, referred to as a search warrant, to be at least unusual and without precedent, and so it seems to be.
 
 
 11
 The EPA reminds us that the denial of a preliminary injunction will be reversed only for an abuse of discretion, Roland Machinery Co. v. Dresser Industries, 749 F.2d 380, 390 (7th Cir.1984), and contends there was no such abuse here. The EPA argues that OMC has failed to show any irreparable harm and disparages OMC's efforts to equate the proposed design activities with actual implementation of the cleanup remedy. It is the EPA's position that the alleged irreparable harm is no more than some temporary inconvenience to OMC which the EPA will attempt to minimize. The irreparable harm, the EPA argues, will be to the EPA and the public interest if the injunction is granted.
 
 
 12
 The EPA further contends that OMC has failed to show any likelihood of success on the merits. This, the EPA argues, is because Phase 1, the design activity, is distinct from Phase 2, the actual construction. The EPA, although not conceding that Phase 1 constitutes an unequivocable taking, recognizes that the district court, for the purposes of OMC's motion, assumed that it constituted a taking triggering the "just compensation" requirement of the Fifth Amendment. To answer that claim, the EPA points out that governmental activity that would effect a taking may be enjoined only if the particular activity lacks statutory or constitutional authorization. See Ruckelshaus v. Monsanto Co., --- U.S., ----, 104 S.Ct. 2862, 2882, 81 L.Ed.2d 815 (1984); cf. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 595-96, 72 S.Ct. 863, 889-890, 96 L.Ed. 1153 (1952) (injunction issued because activity unauthorized). It is the EPA's position that the Tucker Act, 28 U.S.C. Sec. 1491, is the appropriate remedy for any authorized taking, and that compensation need not precede the taking, again relying on Monsanto, 104 S.Ct. at 2880. Although the EPA does not claim to have explicit eminent domain authority, it argues that whether it does or does not is not the test. The EPA explains that the inquiry should be whether the particular statute or its legislative history expresses an unambiguous intention to withdraw the Tucker Act remedy for any taking that may occur in the implementation of the statute. Regional Rail Reorganization Act Cases, 419 U.S. 102, 126, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974); Monsanto, 104 S.Ct. at 2882.
 
 
 13
 OMC, not surprisingly, does not agree with many of the EPA's contentions. In OMC's view, it sought by its application for preliminary relief only to maintain the status quo pending discovery and a hearing on the merits. OMC claims it will be irreparably harmed if the EPA is permitted to enter pursuant to the ex parte warrant and take a sizeable tract of its property which itself is not claimed to be contaminated in violation of its rights under the Fourth and Fifth Amendments to the Constitution. OMC relies upon Schnell v. City of Chicago, 407 F.2d 1084, 1086 (7th Cir.1969), and Henry v. Greenville Airport Comm'n, 284 F.2d 631, 633 (4th Cir.1960), in support of its argument that irreparable harm necessarily flows from a constitutional violation. OMC disclaims any injury to the public or the EPA from a temporary stay and points to the government's own delay of many years in moving to solve the problem. OMC disputes the view that the EPA can enter its private property for its remedial design purpose which is considered by OMC to be part of the EPA's anticipated construction project.
 
 
 14
 OMC does agree that in certain circumstances the Tucker Act provides a legal remedy to parties suffering injuries from authorized governmental actions, but argues that the Tucker Act does not determine whether a governmental agency has substantive authority for its actions. That authority, OMC says, must be found in the legislation under which the agency acts, principles of eminent domain law, and constitutional restraints. By use of the warrant, the EPA, OMC stresses, has the support of the magistrate's contempt powers. OMC concedes that there is no evidence in the Act that Congress intended to withdraw Tucker Act relief, but that, it argues, is because Congress never conceived of the possibility that the EPA would try to take private property for a treatment plant and dump site for wastes from other areas. The Tucker Act, it argues, gives relief only for authorized governmental actions and this proposed EPA entry is totally unauthorized by statute.
 
 
 15
 It is OMC's position that the Act permits only remedial actions at facilities, 42 U.S.C. Sec. 9604(a), and further that it permits only non-contiguous areas to be designated as a single facility or site, 42 U.S.C. Sec. 9604(d)(4), if they both satisfy the definition of facility. 42 U.S.C. Sec. 9601(9). OMC views its complex as separate sites, some contaminated, some not. Relying upon this statutory background, OMC contends that Congress intended to permit the remedy of environmental hazards only at actual waste sites; Congress did not intend to authorize construction of a large EPA project on private uncontaminated property which is in daily use by the owner. OMC charges that for the first time in this court the EPA refers to its actions as a feasibility study rather than, as originally claimed by the EPA in its warrant application and as found by the district court, a field investigation to design the remedy, take borings, and leave survey monuments for construction.
 
 Discussion
 
 16
 We respect the resolution by the district court of this troubling and novel problem, but we take a different view of the EPA's actions and authority no matter how necessary or well-intentioned. Seeking the linchpin of the issue, we must carefully examine the statute the EPA primarily relies upon for its authority to enter for its specified purposes.
 
 
 17
 Recognizing as it must its present lack of clear authority to enter the property to begin actual remedial construction, but hoping in the meantime for some congressional relief or for an order of some sort from some court, the EPA has ingeniously separated out a part of the actual construction, calling it Phase 1. That, it appears, is to permit the EPA to get started on the remedial project without its lack of authority being so obvious. The EPA is alone in denying that surveying the site, placing survey monuments, locating utility lines, and taking weight-bearing subsurface test samples of soil are not, as a usual and practical matter, the customary first things to be done at a construction site. They are too construction-related to be labeled a mere walk-through, or to be considered as authorized under the ordinary and preliminary investigative provisions of the statute discussed below. But even if that not be so, the EPA still lacks authority to enter as the warrant adds nothing when the statute provides nothing.
 
 
 18
 Section 104(a), the principal response section, is merely a general grant of power for remedial action to protect the public health, welfare, or the environment. Section 104(b) provides the authority, when there is reason to believe that a release has or is about to occur, to investigate, monitor, survey, test, and do other necessary information gathering to identify the existence, extent, source, and nature of the hazard. This part of the statute is not now involved, however, as these purposes have already been accomplished at the OMC site.
 
 
 19
 In addition, section 104(b) grants the general authority to "undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations" as are deemed necessary or appropriate "to plan and direct response operations." The district court found implicit in section 104(b) a right of entry for the purpose of planning response operations. Finding that the removal and remedial actions that comprise permissible response actions necessarily require access to the waste site, 42 U.S.C. Sec. 9601(23) and (24), and that response-planning investigations also require access to the waste site, the district court in effect concluded that because the EPA needed access to the site to fulfill its responsibilities Congress must have implicitly granted the authority to enter. We respectfully disagree. The EPA itself has conceded that the source of its authority to enter for actual construction is unclear. Congress, possibly through oversight, neglected to provide for a right of entry for this purpose. The EPA believes that it must petition a federal court to exercise its equitable powers to grant a right of entry. That being so, it is difficult to conclude that Congress implicitly granted, rather than failed to grant intentionally or through oversight, a specific right of entry for response-planning operations.
 
 
 20
 In its application for a warrant, the EPA cited section 104(e)(1) as most germane for its warrant purposes and set forth what in its view constituted the material parts of the section:
 
 
 21
 For purposes of assisting in determining the need for response to a release under this subchapter or enforcing the provisions of this subchapter, ... such [EPA] officers, employees, or representatives are authorized
 
 
 22
 (A) to enter at reasonable times any establishment or other place where such hazardous substances are or have been generated, stored, treated, or disposed of, or transported from;
 
 
 23
 (B) to inspect and obtain samples from any person of any such substance....
 
 
 24
 The EPA's selective quoting of that section better suits its purposes than does the full statute, but even the EPA version is only of limited help as the need for a response has already been determined. The language for the "purpose[ ] of ... enforcing the provisions" of the subchapter also adds nothing specific. What the EPA omitted in its warrant application from that section plainly limits its authority to enter, whatever its broad language, to the "purposes specified in the preceding sentence." The preceding sentence refers to the necessity that any person who has had some involvement with the hazardous substance furnish information relating to such substance and permit EPA access to any records pertaining to the substance. A reading of the full section set forth in footnote 3 puts the authority in context, and deflates the EPA's selective and expanded reading of the section. It is germane to the application, as the EPA asserts, not for what the section says, but for what the section does not say. The power to enter at reasonable times is not given to begin any response construction, or even for design and surveying purposes, if we assume they are to be separated. The authority to enter to inspect and obtain samples, gather information, and inspect records is limited to the hazardous substance itself; the section does not provide authority for taking subsurface samples to determine what construction can be supported or for the other things the EPA seeks to accomplish as preliminary to construction.[6]
 
 
 25
 On those three sections the EPA rests its authority to have a warrant issued for its right of entry for extended design purposes on tracts of private ground which are not themselves alleged to be a part of the hazard. Putting aside whether leaving survey markers in place after this "walk-through" has any bearing on whether a taking has occurred, it appears that what the EPA actually seeks is what in the usual context would be construed as a temporary easement to enter and cross over private ground for its particular purposes. An easement ordinarily is a property right not necessarily available upon demand but may require condemnation. In highway improvement matters, for instance, where the government may seek to eliminate a dangerous curve, a temporary detour over private property, if not voluntarily given, can only be acquired by condemnation. The "quick take" variety permits the condemnor to secure the use of the property immediately upon payment into court of the appraised value, with the final damage amount to be determined later at trial. That may be what EPA needs and does not have. Only Congress, not we, can supply that power.
 
 
 26
 But, EPA argues, never mind, we have an open ended right to enter where we please to fulfill any of our obligations to the public and the bill should be sent by the private owner not to us but to the government in care of the Tucker Act. Then if we were authorized to enter as we claim, says the EPA, and if in fact what we did actually amounted to a taking, then you, the owner, may recover any damages incurred. Otherwise, thank you very much for the several months' use of your land.
 
 
 27
 Regardless of the noble purposes of the EPA, at least in nonemergency situations, that procedural approach strains our usual constitutional concepts. In our view, the sections relied upon by the EPA do not give it the authority to do that which it seeks to do and which the magistrate and the district judge permitted. The statute is not as ambiguous as it is lacking. We cannot, out of a zeal to rid our environment of its hazards, rewrite the statute for the EPA. Congress is very capable of doing that. That congressional capability is demonstrated by this very statute. Under section 106, 42 U.S.C. Sec. 9606, when the EPA determines "that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, [the EPA] may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require." This grant of power, however, applies only in emergency situations. The statute in that event gives the district court broad jurisdiction. The EPA would read out the emergency precondition and seek the same power for its lesser, nonemergency functions, a power which Congress nowhere in the statute bestows upon them. The EPA's powers were circumscribed by a discriminating Congress. We cannot ignore the fact that Congress did not bestow certain powers that it demonstrated it knew how to bestow when it saw the need. Perhaps congressional failing to provide for the circumstance which we face was a mere oversight, but this court is not a committee to consider statutory amendments.
 
 
 28
 Even if Phase 1 is to be separated from Phase 2, it is doubtful that the EPA should be judicially given access at this time to enter to prepare for its intended construction project. As of now the EPA cannot clearly show that it will be entitled to enter the property to begin Phase 2. The EPA seeks, however, to avoid consideration of that next step, but consideration cannot wait as the relationship between the two phases is too close.
 
 
 29
 The EPA needs help to accomplish its purposes, but the help it needs must be sought elsewhere. The EPA has no authority to do what it wants to do, and the Tucker Act neither gives that authority to the EPA, nor a remedy to OMC.
 
 
 30
 Reversed and remanded for the grant of the preliminary injunction sought by OMC pending a hearing on the merits. Circuit Rule 18 shall not apply.
 
 
 31
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 *
 The Honorable Robert A. Grant, Senior District Judge from the Northern District of Indiana, is sitting by designation
 
 
 [1]
 An unscaled plot is attached illustrating the OMC complex as designated. To give some idea of scale the portion designated as Harbor Front Property, which is not contaminated but which will be at least in part occupied, is a tract of approximately thirty acres
 
 
 [2]
 OMC appealed the dismissal and that appeal is now pending in this court
 
 
 [3]
 Section 104(a) of the Act, 42 U.S.C. Sec. 9604(a)(1), in material part provides:
 Whenever (A) any hazardous substance is released ... into the environment ... the President [through the EPA] is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance ... or take any other response measure consistent with the national contingency plan which the President [through the EPA] deems necessary to protect the public health or welfare or the environment....
 
 
 [4]
 Section 104(b) of the Act, 42 U.S.C. Sec. 9604(b), in material part provides:
 Whenever the President ... has reason to believe that a release has occurred or is about to occur ... he may undertake such investigations, monitoring, surveys, testing, and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment. In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions....
 
 
 [5]
 Section 104(e)(1) of the Act, 42 U.S.C. Sec. 9604(e)(1), provides:
 (1) For purposes of assisting in determining the need for response to a release under this subchapter or enforcing the provisions of this subchapter, any person who stores, treats, or disposes of, or, where necessary to ascertain facts not available at the facility where such hazardous substances are located, who generates, transports, or otherwise handles or has handled, hazardous substances shall, upon request of any officer, employee, or representative of the President, duly designated by the President, or upon request of any duly designated officer, employee, or representative of a State, where appropriate, furnish information relating to such substances and permit such person at all reasonable times to have access to, and to copy all records relating to such substances. For the purposes specified in the preceding sentence, such officers, employees, or representatives are authorized--
 (A) to enter at reasonable times any establishment or other place where such hazardous substances are or have been generated, stored, treated, or disposed of, or transported from;
 (B) to inspect and obtain samples from any person of any such substance and samples of any containers or labeling for such substances. Each such inspection shall be commenced and completed with reasonable promptness. If the officer, employee, or representative obtains any samples, prior to leaving the premises, he shall give to the owner, operator, or person in charge a receipt describing the sample obtained and if requested a portion of each such sample equal in volume of weight to the portion retained. If any analysis is made of such samples, a copy of the results of such analysis shall be furnished promptly to the owner, operator, or person in charge.
 
 
 [6]
 We further note that the authority to enter is limited to establishments or other places where the hazardous materials have been generated, stored, treated, disposed of or transported from. It is at least questionable whether the uncontaminated tracts at issue here fit into those permissible categories